LOUIS TAGLIANETTI *vs.* NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY.

FEBRUARY 26, 1954.

PRESENT: Flynn, C. J., Baker, Condon and O'Connell, JJ.

CONDON, J.   This is a petition filed originally in the office of the public utility administrator for the restoration of telephone service which the petitioner alleges the respondent unreasonably and wrongfully discontinued on May 6, 1952. After a hearing the administrator denied the petition. Thereafter the petitioner appealed to the public utility hearing board which heard the appeal on the record made before the administrator and sustained his decision. From the decision of the board denying and dismissing his appeal, petitioner has appealed to this court in accordance with public laws 1949, chapter 2174.

In his appeal he alleges that such decision is erroneous and should be reversed on the grounds that it is unreasonable, unlawful, and against the weight of the evidence. He has briefed and argued here five points in support of those grounds. We shall discuss such points after we have summarized the evidence, which consists of three exhibits and the testimony of petitioner, respondent's special agent Albert Henius, inspector Anthony J. Moretti, and detective

Howard Gibbs of the Cranston police department. Except as to a conflict in the testimony of the inspector and petitioner concerning an alleged admission by the latter that he was engaged in bookmaking, the evidence of the facts and circumstances surrounding the discontinuance of petitioner's telephone service is undisputed.

On the morning of May 6, 1952 inspector Moretti called special agent Henius on the telephone and requested him to check the telephones at petitioner's home, 71 Richard street in the city of Cranston. The reason given for such request was that the police "suspected this location as being a booking location, booking horses." On that same day around 1:30 or 2:30 p.m. Henius together with inspector Moretti and police detectives Gibbs and McGarry went to petitioner's home and were met at the side door by his wife. She refused to admit the police but consented to admit Henius and two employees of respondent who were with him.

Upon entering the hall leading to petitioner's apartment they found the door was locked. Mrs. Taglianetti called to her husband to open it. He answered "Yes" but he did not open it at once. Henius testified that while they were standing at the door he heard several flushings of a toilet in the apartment and other sounds like the moving of furniture. After five or ten minutes had passed he told Mrs. Taglianetti he would not wait any longer and left with the two employees. Henius testified that, at the request of inspector Moretti, he ordered the employees to disconnect the telephone lines on the pole in the street and that this was done "Between two and two-thirty, somewhere around that," before he finally was admitted to petitioner's apartment.

After the lines were disconnected petitioner came out and talked with Henius and the inspector on the sidewalk. He complained that it was unfair to deprive him of his telephone service. Inspector Moretti testified he asked peti-

tioner if he had been "booking" and that he answered "Yes, I have," and also that he did a business of "About $500 a week." Detective Gibbs corroborated the inspector. The petitioner denied that he had made such statements. Shortly after this conversation Henius was admitted to the apartment where he found two telephones each with an extension cord which had not been attached by respondent. The petitioner admitted that he had purchased the cords and attached them himself. He testified: "I put them on one week when my wife was sick so she could get the phone."

On May 9, 1952 Henius received from the Cranston police department the following letter which respondent introduced in evidence as an exhibit: "May 7, 1952, Mr. Albert Henius. Dear Mr. Henius: This department has reasonable grounds for believing and believes that the service furnished by the New England Telephone and Telegraph Company to telephones Stuart 1-9121 listed to Mary Stevens, and Hopkins 1-2051, listed to Louis Taglianetti, both at 71 Richard Street, Cranston, are being used for unlawful gaming, and it is, therefore, requested that the New England Telephone and Telegraph Company discontinue such service forthwith." According to Henius this was "a confirmation of my removal of the telephone service," or "a request to back up the removal of the telephones which were made on the 6th day of the month."

The respondent also introduced as an exhibit the following excerpts from its general regulations on file with the division of public utilities:

"IX. Use Of Voice Recording Equipment In Connection With Telephone Service.
　　A. Unauthorized Attachments or Connections
　　　　No equipment, apparatus, circuit or device not furnished by the Telephone Company shall be attached to or connected with the facilities furnished by the Telephone Company, whether physically, by induction or otherwise, except as provided in this tariff.

> In case any such unauthorized attachment or connection is made, the Telephone Company shall have the right to remove or disconnect the same; or to suspend the service during the continuance of said attachment or connection; or to terminate the service.

X.  Use Of Service For Unlawful Purposes          (N)

> The service is furnished subject to the condition that it will not be used for an unlawful purpose.  Service will not be furnished if any law enforcement agency, acting within its jurisdiction, advises that such service is being used or will be used in violation of law.  If the Telephone Company receives other evidence that such service is being or will be so used, it will either discontinue or deny the service or refer the matter to the appropriate law enforcement agency.    (n)"

The respondent contends that the evidence justified it in terminating petitioner's service for violating either or both of the above regulations.  The petitioner does not deny that such a violation would be a sufficient ground for the discontinuance of his service, but he contends that respondent may not summarily discontinue it without first giving him notice of the charge and an opportunity to be heard thereon and unless at the time the charge is made respondent had reasonable grounds for believing that its facilities were being used in violation of those regulations. He further contends that he was not given such notice and hearing, and as far as appears from the evidence in the instant proceeding neither the police nor respondent had any reasonable grounds, at the time his telephone lines were disconnected at the pole in the street on May 6, 1952 at 2:30 p.m., for believing that he had violated either regulation.

The petitioner contends under his first point that a charge of using the telephone for bookmaking being a criminal offense must be proved beyond a reasonable doubt in this proceeding just as it would in a criminal case.  That is not

the law in this state. Where, as here, a proceeding "is civil in its nature, even though the charge is the commission of a crime, the offence may be established by the preponderance of the evidence." *Glass* v. *State Board of Public Roads,* 44 R. I. 54, 59. Proof beyond a reasonable doubt will be required by this court only if the statute which prescribes the civil remedy or proceeding clearly indicates an intention to such effect on the part of the legislature. See *DaCosta* v. *Rose,* 70 R. I. 163.

The petitioner's second point is that at the time his service was discontinued neither the police nor respondent had reasonable grounds for believing that he was using his telephone for bookmaking or that he had violated respondent's regulation IX A.

Assuming that such contention is correct, it so happened that almost immediately after the telephone lines had been disconnected petitioner himself furnished the evidence necessary to justify what was done. First, he admitted that he had been engaged in illegal bookmaking. Although he denied such admission, we are nevertheless of the opinion that the board was warranted in discrediting his testimony on this point. Secondly, he admitted that he had violated respondent's regulation IX A by attaching unauthorized extension cords to his telephones. His testimony excusing such conduct was scarcely worthy of credence and therefore the board did not err in rejecting it.

Whether or not petitioner's admissions *after* respondent had disconnected the telephones would have been competent or material in an action for damages against respondent for wrongful or unreasonable discontinuance of petitioner's service, they were quite proper and material in this proceeding where he is asking the aid of the state in obtaining *restoration of such service.* At the time of the hearing before the administrator, petitioner appeared as a self-confessed violator of the law and also of respondent's regulations prohibiting unauthorized attachments to the fa-

cilities furnished by it. Either violation would justify the imposition of the penalty of loss of his telephone service. As grounds for its refusal to restore the service, respondent relied upon its *duty* to impose such penalty for the first violation and on its optional right to impose it for the second violation. We cannot say that on the evidence before it the board was clearly wrong in upholding such refusal.

The petitioner finally contends that the board's decision is erroneous because such regulations on their face deprive him of substantive and procedural due process of law guaranteed by section 10 of article I of the constitution of Rhode Island and by section 1 of article XIV of amendments to the constitution of the United States. We need not discuss further the petitioner's argument in support of that contention, because in our opinion neither constitutional guaranty applies to this case. As to the guaranty of due process in section 10 of article I of the constitution of this state, we have recently reiterated what this court long ago decided and has since repeatedly reaffirmed, namely, that this section is narrower in scope than the due process clause of the fourteenth amendment to the federal constitution and applies only in favor of those accused of crime in a criminal proceeding. *Sepe* v. *Daneker*, 76 R. I. 160. It goes without saying that the instant proceeding, which petitioner himself has invoked to determine whether respondent was justified under its regulations IX and X in depriving him of telephone service, is in no sense criminal in nature.

The due process clause of the fourteenth amendment to the federal constitution is a limitation only on state action, as its language quite plainly declares as follows: "nor shall any state deprive any person of life, liberty, or property, without due process of law * * *." Regulations IX and X are prescribed by respondent solely to govern the use of its telephones by persons with whom it has contracted to provide telephone service and such regulations are in the nature

of conditions attached to the right to the continuance of such service. Action taken initially by respondent to impose the penalty therein prescribed for the violation of such conditions is in no sense action by the state. In our opinion the fact that the regulations are filed with the division of public utilities and are approved by the administrator does not transform them into acts of the state. Such filing and approval are merely incidents of the state's regulatory supervision of respondent as a public utility and are designed to inform the patrons thereof of their rights and obligations in the use of the service offered by respondent to the public.

Whether in any given case the respondent, in depriving a person of service for violations of such regulations, has acted reasonably and fairly is a question which such person may have determined, as in the instant case, by petition to the administrator with an ultimate appeal to this court. This procedure is itself due process as far as the intervention of the state is concerned and is assurance to a patron of respondent's public utility of a right to be heard if respondent in discontinuing service has acted wrongfully or unreasonably. But petitioner argues that this is not enough and that respondent has no constitutional right to suspend service without first specifically charging him with violations of conditions attached to his right thereto and proving them.

There is no merit in that contention. On the contrary it has been held that where a public utility's published tariffs "contain a provision preventing lessees of its wires from using its service to violate, directly or indirectly, any federal or state law," the court will not by injunction aid one whom the utility justifiably believes is illegally using its service. *Hamilton* v. *Western Union Telegraph Co.*, 34 F. Supp. 928, 929. Moreover in that case the court said: "Even without such provision in the tariffs, the defendant would not only be authorized, it would be obligated, to discontinue service

which contributes to and facilitates the operation of a business or enterprise in violation of law. Any person or company that knowingly assists in a scheme to violate the law is subject to prosecution. A court of equity will not restrain the discontinuance of service by a utility if the character of the use of the service is such as to justify an honest doubt as to its legality. The service which a person has the right to demand of a public utility is service lawful in character." There is no intimation in the opinion in that case that the company is bound to refrain from discontinuing service before first giving the user notice of the charge against him and an opportunity to be heard thereon.

Nor is *Andrews* v. *Chesapeake & Potomac Tel. Co.*, 83 F. Supp. 966, upon which petitioner relies, authority for a different view. The opinion in that case is substantially to the same effect as the *Hamilton* case. In fact the court left no doubt of its position in this respect by stating at page 968: "* * * a telephone company may refuse to furnish or may discontinue service that has been furnished if the service is used for a criminal purpose, such as violation of the gambling statutes." It further stated: "A public utility has not only a right but a duty to refuse to render service for criminal purposes."

In other words, in that case the court held that the company may act of its own volition, but when it does so it should have reasonable grounds for believing that the use of its service is illegal and mere notice of *suspicion* from a law enforcement agency to that effect was not enough. To prevent an injunction being issued it would be the company's duty, the court said, to establish the fact of illegality by a preponderance of the evidence. But this is not to say that the utility could not act without first notifying the user of the charge against him and giving him an opportunity to be heard. Incidentally that case did not involve the due process clause of the fourteenth amendment, as the case arose in the District of Columbia where such amendment

was not applicable.  *Corrigan* v. *Buckley,* 271 U. S. 323; *Shelley* v. *Kraemer,* 334 U. S. 1.

The petitioner's appeal is denied and dismissed, the decision appealed from is affirmed, and the record in the case is ordered sent back to the public utility hearing board.

*Leo P. McGowan, Henry E. Laliberte,* for petitioner.

*Swan, Keeney & Smith, John B. Dillon,* for respondent.

*William E. Powers,* Atty. Gen., *Archie Smith, Assistant Atty. Gen.,* for state.