PATERSON PUBLISHING COMPANY, INC., PLAINTIFF-APPELLANT, v. NEW JERSEY BELL TELEPHONE COMPANY, DEFENDANT-RESPONDENT.

Argued April 16, 1956—Decided May 7, 1956.

462

*Mr. George R. Sommer* argued the cause for the appellant.

*Mr. A. J. Bittig* argued the cause for the respondent (*Mr. Thomas Glynn Walker,* attorney).

The opinion of the court was delivered by

JACOBS, J. This is an appeal from an order of the Board of Public Utility Commissioners which declined to direct the New Jersey Bell Telephone Company to reinstate the telephone services formerly rendered to the Paterson Publishing Company. We certified under *R. R.* 1 :10–1.

In July 1954 three telephone lines were installed at 20 Church Street, Paterson, for Secretarial Office Services which was represented as a public secretarial business. In August 1954 the Telephone Company installed a monitor switchboard with five trunks and operator's head set, eight extensions, five head sets, five voice recorder connectors, and another line which did not go through the switchboard. In November 1954 the telephone facilities were transferred to Paterson Publishing Company which disseminates racing information and offers public secretarial services. In December 1954 the Telephone Company installed five additional lines, making 11 in all at the 20 Church Street premises of Paterson Publishing Company. After receiving communications from the Prosecutor of Passaic County, the Telephone Company served notice that it would disconnect the telephone facilities of Paterson Publishing Company because they were being used for purposes of aiding and abetting illicit gambling on horse races in violation of law and the Telephone Company's tarriff regulations. A similar notice was sent to Atlantic Television Corporation (a wholly-owned subsidiary of Service Television Company) for which cor-

poration the Paterson Publishing Company was disseminating racing information. Thereafter the Paterson Publishing Company and the Atlantic Television Corporation sought relief in the Chancery Division. Judge Grimshaw permitted the Atlantic Television Corporation to retain one telephone for its television repair business but denied all other prayers for preliminary relief. On March 18, 1955 he denied *in toto* the Paterson Publishing Company's application for preliminary relief and on March 22, 1955 the Appellate Division took like action. In the meantime both companies had applied to the Board of Public Utility Commissioners for orders compelling the restoration of their telephone service. After full hearings their applications were denied by the Board for reasons expressed in formal decisions. By stipulation the record in the Atlantic Television Corporation's proceeding before the Board has been made part of the Paterson Publishing Company's matter which is the only one before this court for determination.

A fair reading of all of the testimony establishes beyond question that Paterson Publishing Company was an integral part of an operation which encompassed the three corporate entities (Atlantic Television Corporation, Service Television Company and Paterson Publishing Company) and entailed the dissemination of racing information primarily for the use of bookmakers. Service Television Company issued a sporting sheet for which it charged $50 per week. This contained racing information and predictions and entitled the subscribers to obtain telephone information from Paterson Publishing Company as to the winners of races which had recently been completed. In addition, Service Television Company furnished a special service to any customers who wanted flash information as to the result of a race within a minute or two after it had been run. The charges for this special service were $15 for the first result and $10 for each subsequent result with a maximum charge of $50 per day per customer. These charges were paid to Service Television Company which had made arrangements through Paterson Publishing Company for the furnishing

of the flash information. Paterson Publishing Company acquired the information largely by long distance telephone calls to a corporation in Delaware and then transmitted it directly to Service Television Company's customers in response to their telephone calls.

Testimony by the dominating official of Service Television Company and Atlantic Television Corporation indicated that the sporting sheet was usually mailed in care of general delivery because the real addresses of the customers were unknown; indeed, in many instances, the real names of the customers were likewise unknown. Payments for the flash information were made in the form of Western Union money orders and they were in large and varying amounts; *e.g.,* the record indicates that F. J. Sullivan paid $675 during February 1955 and $500 during the following month; that E. Bello paid $420 during February 1955 and $220 during the following month; and that G. Gustin paid $490 during March 1955. Mr. McMahon, a qualified representative of the Thoroughbred Racing Protective Bureau, testified that he could see no reason for anyone wanting flash information of the type being disseminated except "bookmakers and past posters." He defined a past poster as "a person who cheats the bookmaker by obtaining the official result of a race and then with that knowledge making a bet with the bookmaker who does not know yet what the official result is." He stated that he had never heard of a legitimate horse owner subscribing to a flash service such as that offered by Service Television Company and he readily distinguished its service from that rendered by newspapers and other traditional media which simply furnished delayed racing information to the general public for nominal charge.

Despite its cost, most of the racing customers of Service Television Company subscribed to the flash service. As explained by Mr. McMahon, some persons will place their bets only with bookmakers who will let them know immediately which horse won so that they will be in a position to determine how much to bet on the next race. It is conceivable, as Paterson Publishing Company suggests, that there may

be instances where a person wholly unconnected with illicit gambling operations will want immediate information as to the outcome of a race and will be willing to pay a very substantial charge for such information. But such instances would undoubtedly be isolated and no legitimate business could operate profitably on their foundation. Upon the evidence in the instant matter, we have no hesitancy in finding that the business of Paterson Publishing Company was primarily set up to serve bookmakers and their patrons and that during its operation it in fact did serve such persons. Upon this finding it is entirely clear that the order of the Board of Public Utility Commissioners declining to direct the reinstatement of the telephone services formerly rendered to Paterson Publishing Company must be sustained. See *N. J. S. 2A* :146–3; *State v. Western Union Telegraph Co.,* 12 *N. J.* 468, 481 (1953), appeal dismissed 346 *U. S.* 869, 74 *S. Ct.* 124, 98 *L. Ed.* 379 (1953); *McBride v. Western Union Tel. Co.,* 171 *F. 2d* 1 (9 *Cir.* 1948); *Tracy v. Southern Bell Telephone & Telegraph Co.,* 37 *F. Supp.* 829 (*D. C. D. Fla.* 1940); *Hamilton v. Western Union Telegraph Co.,* 34 *F. Supp.* 928 (*D. C. N. D. Ohio* 1940), appeal dismissed 118 *F. 2d* 902 (6 *Cir.* 1941); *Howard Sports Daily v. Weller,* 179 *Md.* 355, 18 *A. 2d* 210 (1941); *Taglianetti v. New England Tel. & Tel. Co., R. I.,* 103 *A. 2d* 67 (1954); *Application of Annette,* 74 *N. Y. S. 2d* 330 (*Sup. Ct.* 1945), affirmed 273 *App. Div.* 997, 79 *N. Y. S. 2d* 896 (1948), leave to appeal denied 298 *N. Y.* 931, 82 *N. E. 2d* 44 (1948); *Tela-News Flash v. District Attorney,* 197 *Misc.* 1015, 96 *N. Y. S. 2d* 338 (*Sup. Ct.* 1950), affirmed 277 *App. Div.* 1119, 101 *N. Y. S. 2d* 245 (1950), leave to appeal denied 302 *N. Y.* 951, 98 *N. E. 2d* 709 (1951); *Martinelli v. New York Telephone Co.,* 205 *Misc.* 503, 129 *N. Y. S. 2d* 411 (*Sup. Ct.* 1954).

 Bookmakers and those who aid and abet them are equally condemned by the policy of our law. See *N. J. S. 2A* :112–3; *N. J. S. 2A* :85–14; *State v. Morano,* 134 *N. J. L.* 295, 301 (*E. & A.* 1946). Where a telephone company knows or has sufficient reason to know that its services are being

used in aid of bookmaking it has the right (and indeed the duty) to discontinue them; *cf. N. J. S. 2A* :146–3 where the Legislature expressly declared that if a telephone company "knowingly carries any message of a kind which will further or promote the interest of any unlawful pursuit, or enable a person to carry on any business or practice declared illegal," it is guilty of a misdemeanor. In *State v. Western Union Telegraph Co., supra,* Justice Wachenfeld, in an opinion delivered for the entire court, referred approvingly to the many decisions elsewhere which have sustained the "right of telegraph and telephone companies to refuse service where it promotes illegality." In *Howard Sports Daily v. Weller, supra* [179 *Md.* 355, 18 *A. 2d* 214], Judge Delaplaine noted that it was "well settled that a telegraph company has the right to refuse service which is connected with illegal operations"; and in *Tracy v. Southern Bell Telephone & Telegraph Co., supra* [37 *F. Supp.* 830], Judge Strum, in dismissing a complaint which sought to compel the reinstatement of services, remarked that a telephone company may not be compelled to furnish services which will be used, or which the company "has reasonable cause to believe will be used, in furtherance of illegal enterprises." See also *Hamilton v. Western Union Telegraph Co., supra.* Cf. *Andrews v. Chesapeake & Potomac Telephone Co.,* 83 *F. Supp.* 966 (*D. C. D. C.* 1949).

Several New York decisions have appropriately applied the foregoing principles in situations comparable to the instant matter. In *Application of Annette, supra,* Justice Miller dismissed an application for reinstatement of telephone services upon a finding that the applicant was furnishing immediate racing results to bookmakers. In *Tela-News Flash v. District Attorney, supra* [197 *Misc.* 1015, 96 *N. Y. S. 2d* 341], Justice Hooley took similar action and in the course of his opinion made the following observations which are particularly pertinent here:

"The fact that the petitioner charged $60 per week for its services in furnishing horse racing information to its subscribers is clearly indicative that the service was to aid and abet bookmaking. On the

argument herein, petitioner's counsel conceded that its service was quite unique in that they were able to furnish the results of horse races immediately after the race had been run. He sought to argue that this information was of value to bettors in that they would be in a position to again risk their winnings on the first couple of races on the subsequent races to be run that day. The plain fact is that unless one were to bet at a pari-mutuel track where betting is legal, there is no way for a bettor who desires to wager on horse racing other than to do business through bookmakers. It is clear that no individual would pay $60 per week for this service while attending the race track. The service, however, would be of real value to a bookmaker and to his patrons because if the patrons should win in the early races they might easily be encouraged to make bets on subsequent races on the same day."

See also *Martinelli v. New York Telephone Co., supra; Movietime, Inc., v. New York Tel. Co.*, 277 *App. Div.* 1057, 101 *N. Y. S. 2d* 71 (1950).

It is of course true, as the Paterson Publishing Company points out, that a public utility such as a telephone company is under a general obligation to serve the public without arbitrary discrimination; and the utility is not justified in refusing services to legitimate business enterprises simply because they disseminate information which may possibly be used by some for illegal purposes. Thus, reputable newspapers contain racing results and other sporting items which are readily available to all members of the public including, incidentally, those who may be engaged in bookmaking or other illicit activities. These racing results are delayed rather than immediate, no charges are imposed beyond the normal prices of the newspapers, and the newspapers are not distributed for the primary purpose of furthering gambling or other illegal activities. *Cf. Pennsylvania Publications v. Pennsylvania Public Utility Comm.*, 349 *Pa.* 184, 36 *A. 2d* 777, 153 *A. L. R.* 457 (1944). However, in the instant matter, the operation conducted by Paterson Publishing Company was not a legitimate one which was only incidentally used by persons participating in bookmaking; on the contrary its very design was to serve such persons. The Board of Public Utility Commissioners so found and, even if the evidence were less com-

pelling than it actually is, we would not upset its finding in the utter absence of any affirmative showing that it was unreasonable, arbitrary or capricious. See *In re Greenville Bus Co.,* 17 *N. J.* 131, 137 (1954) ; *New Jersey Power & Light Co. v. Borough of Butler,* 4 *N. J. Super.* 270, 279 (*App. Div.* 1949); *Rahway Valley R. Co. v. Board of Public Utility Com'rs,* 127 *N. J. L.* 164, 167 (*Sup. Ct.* 1941) ; *cf. R. S.* 48:2–46 ; *R. R.* 4:88–13.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, JACOBS and BRENNAN—6.

*For reversal*—None.