In the Matter of DELAWARE SPORTS SERVICE, a partnership.

2

(*August* 6, 1963.)

STIFTEL, J., sitting.

*E. Norman Veasey*, Chief Deputy Attorney General, and *Ruth M. Ferrell*, Deputy Attorney General, for the State of Delaware, intervenor, on the briefs. *Januar D. Bove, Jr.*, former Attorney General, trial attorney for intervenor before the Commission.

*Henry A. Wise, Jr.*, and *Richard Allen Paul* (of Wise and Suddard) for Delaware Sports Service.

*Hugh L. Corroon* (of Berl, Potter and Anderson) for The Diamond State Telephone Company.

Superior Court for New Castle County, No. 1321, Civil Action, 1962.

STIFTEL, Judge.

Appeal from an order of the Public Service Commission which refused to direct the Diamond State Telephone Company to continue its telephone service to the Delaware Sports Service.

The following facts are not in dispute:

The Delaware Sports Service has been located in Wilmington, Delaware, for more than a decade. Its only reason for existence is to supply "flash race track results" to its customers. Generally, its method of operation is to place an employee inside a race track who instantaneously communicates, by visual device, such as hand signals, or by radio, with an employee outside the race track who has an open telephone line to relay the information he acquires to Delaware Sports Service in Wilmington. For many years Delaware Sports Service, or its predecessor in name, Delaware Wired Music, supplied instantaneous detailed information on each race to the Wilmington headquarters but in recent years only the name of the winner of each race has been supplied. However, any customer on the open line from the race track through the Wilmington switchboard was able to determine the time the horses left the post and the time the horses finished the race.

A person became a customer of Delaware Sports Service by telephoning the Wilmington office and asking the operator of Delaware Sports Service what Delaware Sports Service had available. The customer was told that he was entitled to the name of the unofficial winner of the race for $20; of two races for $30; and

of five races for $50. The money was payable in advance
by sending a Western Union money order telegram to
Delaware Sports Service. The customer seldom used his
own name when calling Delaware Sports Service for the
results. When a person would call for results, the switch-
board operator would immediately check her records so
as to determine whether or not the money order had been
transmitted in advance. If so, she would give the customer
the immediate result, which was usually no more than one
to three minutes after the race was run and sometimes
sooner.

For many years the Attorney General's office had
attempted to terminate the business of the Delaware
Sports Service. After an unsuccessful attempt to ter-
minate this business through the courts in 1949, *Tollin
v. State,* 7 Terry 120, 78 A.2d 810, the Legislature, on
the recommendation of the then Attorney General, en-
acted certain statutes which the Attorney General hoped
to use to eliminate businesses of this nature.[1]

The present phase started in 1959. On October 13,
1959, the Attorney General sent a letter to the Diamond
State Telephone Company requesting it to discontinue its
service to Sports Service; whereupon Diamond State no-

---

[1]See 11 *Delaware Code* Secs. 671-677, which read as follows:

"§ 671. Definitions

"As used in sections 671-677 of this title, unless the context indicates
a different meaning—

" 'Call service' means the furnishing of information upon request
therefor or by prearrangement over general telegraphic, telephonic or tele-
typewriter exchange or toll service;

" 'Dissemination' means the act of transmitting, distributing, advising,
spreading, communicating, conveying or making known;

tified Delaware Sports Service of its intention to discontinue telephone service to it pursuant to Title 11 *Delaware Code,* Sec. 675.

Shortly after the receipt of the Diamond State letter, Sports Service filed an action, on October 22, 1959, in the Court of Chancery, praying that Diamond State be enjoined from discontinuing its telephone service, contending that Sec. 675 of Title 11 *Delaware Code* was unconstitutional.

On September 8, 1960, the Court of Chancery ruled Section 675 unconstitutional because it failed to provide

---

Note 1 continued—

" 'Person' or 'whoever' means a corporation (including a public utility), partnership or association, as well as a natural person;

" 'Private wire' means any and all service equipment, facilities, conduits, poles, wires, circuits, systems by means of which service is furnished for communication purposes, either through the medium of telephone, telegraph, Morse, teletypewriter, loudspeaker or any other means, or by which the voice or electrical impulses are sent over a wire, and which services are contracted for or leased for service between two or more points specifically designated, and are not connected to or available for general telegraphic, telephonic or teletypewriter exchange or toll service, and includes such services known as 'special contract leased wire service', 'leased line', 'private line', 'private system', 'Morse line', 'private wire', but does not include the usual and customaryt elephone or teletypewriter service by which the subscriber may be connected at each separate call to any other telephone or teletypewriter designated by him only through the general telephone or teletypewriter exchange system or toll service;

" 'Public utility' means a person, partnership, association or corporation, owning or operating in this State equipment or facilities for conveying or transmitting messages or communications by telephone or telegraph to the public for compensation."

"§ 672. Furnishing wire or disseminate gambling information

"No public utility shall knowingly furnish to any person any private wire for use or intended for use in the dissemination of information in furtherance of gambling or for gambling purposes."

"§ 673. Using wire to disseminate gambling information; receiving gambling information

an opportunity to the telephone subscriber for a hearing, and the Court enjoined Diamond State from terminating plaintiff's present telephone service prior to a hearing presumably before the Commission on the uses to which plaintiff put such service. See *Tollin v. Diamond State Telephone Co.*, Del.Ch., 164 A.2d 254. Thereafter, the Attorney General again requested the Telephone Company to discontinue telephone service to Sports Service. Whereupon, Diamond State notified Sports Service that it would terminate its telephone service unless Sports Service filed a petition with the Public Service Commission by a certain date. Sports Service filed a petition with the Public Service Commission seeking to prohibit the telephone company from terminating its services. As a preliminary step the Commission decided, on briefs, by

Note 1 continued—

"No person shall knowingly use any private wire in the dissemination of or receive information in furtherance of gambling or for gambling purposes."

"§ 674. Business of disseminating gambling information; receiving gambling information

"No person shall engage in the business of, or receive compensation in any form or measure for, the dissemination of or receive information in furtherance of gambling or for gambling purposes by means of private wire or wire, or by means of a call service."

"§ 675. Revocation of service contracts; exemption from liability

"Any public utility shall, when it is advised in writing by any law enforcement agency acting within its jurisdiction that any service furnished by it is being used in the dissemination of information in furtherance of gambling, or for gambling purposes, revoke its contract to furnish any such service.

"No public utility shall be liable at law or in equity for any damages or penalties, either civil or criminal, for such revocation of contract."

"§ 676. Violations and penalties

"Whoever violates any of the provisions of Sections 671-677 of this title shall pay the costs of prosecution and be fined not less than $500 nor more than $5,000, or imprisoned not more than 12 months, or both."

"§ 677. Sections 671-676 as exercise of police power; construction

"Sections 671-676 of this title shall be deemed an exercise of the police power of this State for the protection of the public welfare, health, peace, safety and morals of the people of this State, and all of the provisions of sections 671-676 of this title shall be liberally construed for the accomplishment of this purpose."

written opinion dated December 14, 1961, that it had jurisdiction to consider the petition. The Attorney General's request to intervene was granted.

A hearing on the merits of the petition was held by the Commission March 12, 1962, through March 15, 1962. The intervenor presented 9 witnesses and introduced 26 exhibits. At the conclusion of the hearing, the facts and the law were briefed and the Public Service Commission rendered a written opinion on September 12, 1962, concluding, in effect, that Diamond State was justified in its action because Delaware Sports Service was using its service to further illegal gambling. Subsequently, a motion requesting reargument and reconsideration was filed and the request was denied on October 10, 1962. Sports Service then took this appeal claiming (1) that the hearing before the Public Service Commission was a denial of due process of law; (2) that the findings of the Commission failed to comply with the laws pertaining to hearings before the Public Service Commission, namely, 26 *Delaware Code*, Secs. 183 and 187;[2] and (3) that the

---

[2] 26 *Del. Code*, §§ 183 and 187, read as follows:

"§ 183. Rules governing conduct of hearings [before the Public Service Commission]; findings and order

"(a)   All hearings before the Commission, or its designated representative, shall be public, and shall be conducted in accordance with the rules of practice and procedure prescribed by the Commission. In the conduct of such hearings, the Commission shall not be bound by the technical rules of evidence. A full and complete record shall be kept of all proceedings had before the Commission, or its representative, in any formal hearing, and all testimony shall be taken down by a reporter designated by the Commission, and the parties shall be entitled to be heard in person or by attorney, and to introduce evidence.

"(b)   After the conclusion of the hearing, the Commission shall make and file its findings with its opinion, if any, and its order thereon. Its findings shall be in sufficient detail to enable the court on appeal to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence."

"§ 187.   Privilege against self-incrimination

"No person shall be excused from testifying or producing any book, document or paper in any investigation or inquiry by or upon hearing be-

Diamond State Telephone Company and the intervenor failed to establish their case by a preponderance of the evidence.

At the hearing, the telephone company argued that it had the right to act to discontinue telephone service to Delaware Sports Service because such service was being used by recipients to further illegal horse race gambling in this state and in other states. Specifically, Diamond claimed it had the right to act by virtue of Sec. 674 of Title 11 *Delaware Code*, or by reason of tariff No. 1, paragraph 20,[3] which it had previously filed with the Public Service Commission, or under the principle that it is never required to furnish telephone service where the use by the subscriber is against the public policy of this state.

A telephone company must furnish adequate public service to its paying customers without discrimination. 26 *Del. Code* § 135. See *Tracy v. Southern Bell Telephone and Telegraph Co.*, D.C.Fla., 37 F.Supp. 829,

---

Note 2 continued—

fore the Commission, or any member or examiner thereof, upon the ground that the testimony, evidence, book, document or paper required of such person may tend to incriminate such person or subject such person to penalty, or forfeiture, but no person shall be prosecuted, punished, or subjected to any penalty or forfeiture for or on account of any act, transaction, matter or thing concerning which he shall, under oath, have testified or produced incriminating evidence. No person so testifying shall be exempt from prosecution or punishment for any perjury committed by such person in his testimony. Nothing contained in this section is intended to give, or shall be construed in any manner to give any corporation immunity of any kind."

---

[3]Tariff No. 1, paragraph 20, reads as follows:
"20. USE OF SERVICE FOR UNLAWFUL PURPOSES
"Service is furnished subject to the condition that it will not be used for an unlawful purpose. Service will not be furnished if any law enforcement agency, acting within its jurisdiction, advises that such service is being used or will be used in violation of law, or if the Telephone Company receives other evidence that such service is being or will be so used."

830. It cannot refuse service to a legitimate enterprise. See *Paterson Publishing Co. v. New Jersey Bell Telephone Co.*, 21 N.J. 460, 122 A.2d 599, 603. Generally, however, a telephone company may take the necessary steps to discontinue such service where it is reasonably satisfied that such service is being utilized by its customer to violate the statutory law against dissemination of racing information, *State v. Chesapeake and Potomac Telephone Co.*, 121 W.Va. 420, 4 S.E.2d 257, 258; or, where the dissemination of such racing information is in violation of one of its published tariffs, *McBride v. Western Union Telegraph Co.*, 9 Cir., 171 F.2d 1; see *Hamilton v. Western Union Telegraph Co.*, D.C.Ohio, 34 F.Supp. 928, 929; or where the use of such telephone service is against public policy, such as in the furtherance of bookmaking, an illegal enterprise in this and other states, *Tracy v. Southern Bell Telephone Co.*, supra; see *Taglianetti v. New England Telephone and Telegraph Co.*, 81 R.I. 351, 103 A.2d 67, 70, 71; Anno: 153 A.L.R. 463.

Sections 674 and 677, Title 11 *Delaware Code*, makes dissemination of information in furtherance of gambling or for gambling purposes by means of a call service a crime.[4] The published tariff permits the telephone company to discontinue service if a law enforcement agency advises that such service is being used or will be used in violation of law. Sports Service raises many objections to Diamond's use of either the statute or the tariff as a basis for discontinuing service. It is not necessary, here, to explore petitioner's arguments in these directions because the telephone company, as stated above, may also act to discontinue service where such service has a ten-

---

[4] This statute was upheld as not in violation of freedom of speech in *State v. Michael C. Benicky*, et al., Criminal Actions Nos. 96, 97, 98, 1960, Super.Ct.Del., Kent Co. (Storey, J., unreported decision dated March 28, 1961), where the Court also stated that it was not vague and indefinite.

dency to promote illegal gambling, contrary to public policy. *Howard Sports Daily v. Weller*, 179 Md. 355, 18 A.2d 210; *Hamilton v. Western Union Telegraph Co.*, D.C., Ohio, 34 F.Supp. 928; *Rubin v. Pennsylvania Public Utility Commission*, 197 Pa. Super. 157, 177 A.2d 128; *Lipton v. New York Tel. Co.*, Sup., 125 N.Y.S.2d 251.

The Commission, in reviewing the purported action of the telephone company to discontinue telephone service to Sports Service, decided that Diamond State was justified in concluding that petitioner was using its telephone service to further illegal gambling over a many state area, against the public policy of this and other states. Its decision is now before this Court on appeal.

On appeal to this Court from the Public Service Commission, the cause is determined from the record, which includes a written copy of the evidence and the findings, order and opinion of the Commission. This Court may affirm, modify or revise the order of the Commission, in whole or in part, or may remand the proceedings to the Commission, in whole or in part. 26 *Del. Code,* Sec. 192(b).[5] The language of Section 192(b) is essentially the same as the language contained in the statute governing appeals from orders of the Workmen's Compensation

---

[5]26 *Del. Code,* Sec. 192(b) reads as follows:

"Upon every appeal the cause shall be determined by the Court from the record (which shall include a typewritten copy of the evidence and of the findings and order and opinion, if any, of the Commission) without a jury, and the court may affirm, modify or revise the order of the Commission, in whole or in part, or may remand the cause to the Commission for rehearing, in whole or in part. The Superior Court is vested with jurisdiction and power to hear and determine all such appeals, and with power to make any and all rules needful or convenient in the premises. Upon the determination of every appeal, a copy of the opinion and order of the Court shall be certified to the Commission."

Commission. 19 *Del. Code,* Sec. 2350(b).[6]

The rule which has been applied in workmen's compensation cases is the rule which governs the present case on appeal, In the Matter of Application of Diamond State Telephone Company, Supreme Ct. Del., 107 A.2d 786, 792-793. In workmen's compensation cases a court never disturbs a finding of the Commission, if there is evidence in the record from which its conclusions could have been fairly and reasonably drawn. *Wright v. American Brake Shoe Co.,* 8 Terry 299, 90 A.2d 681, 684. Thus, the Superior Court sits as a reviewing court only and not as an administrative agency of superior rank. In the Matter of Application of Diamond State Telephone Company, supra., the decision of the Commission must stand if there is evidentiary basis for it; cf., *Hill Road Publishing & News Co. v. Public Utility Hearing Board,* Supreme Ct. R.I., 190 A.2d 729, 731; and it is not the job of this Court to re-evaluate pertinent evidence adduced before the Commission.

Plaintiff claims that the hearing before the Commissions was in violation of the due process clause of the Federal Constitution for the reason that the evidence adduced at the hearing by the telephone company and the intervenor was not competent evidence upon which a finding should be based. The primary issue this argument presents is whether there was proper evidence before the Commission to justify its action.

---

[6]19 *Del. Code,* Sec. 2350(b) reads as follows:

"In case of every appeal to the Superior Court, the cause shall be determined by the Court from the record, which shall include a typewritten copy of the evidence and the finding and award of the Board, without the aid of a jury, and the Court may reverse, affirm, or modify the award of the Board, or remand the cause to the Board for a rehearing. In case any cause shall be remanded to the Board for a rehearing, the procedure and the rights of all parties to such cause shall be the same as in the case of the original hearing before the Board."

The record is lengthy. The testimony alone covers more than 700 pages. The Attorney General admits that much of the testimony presented by the defendants was hearsay and would generally be inadmissible in a court trial. But he contends that hearsay evidence is permissible before the Commission by reason of Sec. 183, Title 26 *Delaware Code,* which provides that "[T]he Commission shall not be bound by the technical rules of evidence." In any event. he claims that the Commission made its findings on probative evidence, and did not consider in its findings evidence that would normally be inadmissible in a court trial. Thus, he claims that *Geegan v. Unemployment Compensation Commission,* 6 Terry 513, 76 A.2d 116, is inapplicable since in that case the decision of the Unemployment Compensation Commission could not stand because it was based solely and exclusively on hearsay, which is not true here. In Geegan, the Court explained that the purpose of the statute which permits a commission to accept evidence not conforming to the legal rules is to free commissions from technical rules in order to prevent the invalidation of administrative orders after such evidence has been received.

Throughout the proceedings below, the Attorney General requested the Commission to accept evidence that would ordinarily be inadmissible in a court trial, relying on the rule of the statute. The Commission, with some reluctance, allowed this procedure, reserving the right to strike it or ignore it at the time of its decision. The statutory rule that commissions are not bound by the same strictness as to the admission of evidence as a court, is a good one. It protects commissions from reversible error for admitting evidence which is not generally admissible in a court trial for the reason that legislators recognize that so often members of commissions are not as conversant with the technical rules of evidence as are judges. The

Commission may, in its discretion, accept any evidence that is offered. There must, however, be a residuum of legal evidence that supports its final determination. See, *U. S. ex rel. Dong Wing Ott v. Shaughnessy,* D.C.S.D.N.Y., 116 F.Supp. 745. Here, the Commission ignored facts in the record which it considered inadmissible and based its findings on admissible, competent evidence.

A fair reading of all the testimony on which the Commission relied establishes that it was justified in reaching its conclusion that Delaware Sports Service disseminated flash results of horse races primarily for the use of bookmakers.

Intervenor presented testimony of several qualified experts. Each expert agreed that the service rendered by Delaware Sports Service was only of significant importance to a bookmaker or a past poster.[7] Mr. Albert Tollin, the dominating partner of Delaware Sports Service, testified that the present service furnished by Sports Service was of no significant value to bookmakers since it did not contain prices paid, the names of the horses that finished second and third, nor the time of the beginning or finish of a race. Intervenor's experts disagreed with this testimony. First of all, they explained that the information did furnish the time of each race because the telephone operator would announce to its customers that the horses "were running", which indicated the beginning of a race, and any customer could determine the finish of the race when the name of the winner was announced. Even though the name of the winner was unofficial, testimony indicated that a "pitcher" employed by Sports Service had

---

[7]"Past poster" may be defined as a person who cheats the bookmaker by obtaining the unofficial result of the race and then, with that knowledge, makes a bet with the bookmaker, who does not have the result at the time the bet is placed.

never been wrong. Daniel D. Moynihan, Special Agent with the New York State Commission of Investigation, noted the importance to a bookmaker of receipt of immediate race results. He explained that it helps a bookmaker to estimate his financial position in regard to the day's betting. Thus, if he should find himself losing heavily on the first race, he may arrange after the first race to lay-off with other bookmakers some of the bets he receives on the second race. On the other hand, since the percentages are always in favor of the bookmaker, if he runs fairly well in the first race, he may decide not to lay-off any bets on the second race. Also, by getting immediate information on the winner of a race, he can avoid being past posted, and thus avoid taking a bet from another bookmaker or private bettor on the winner after the race had actually been run.

Furthermore, Moynihan stated that a bookmaker receiving this flash information serves as a convenience for the bettor and consequently stimulates his own business, since a bettor's wagering or betting may be stimulated by his immediate knowledge of the results. If he wins, he frequently finds that he is ahead and therefore he can afford to gamble a little more on the next race. Consequently, Mr. Moynihan explained, flash results have a distinct advantage over radio and newspapers, which do not give immediate results and consequently would not enable the bookmaker to avoid past posting, or assist him with lay-offs or stimulation of bets. Also, it enables the unscrupulous bookmaker to accept bets on a loser when he knows the winner. Moynihan further explained that even though the odds were not furnished with the flash results by Sports Service, a bookmaker can nevertheless figure them out roughly if he properly understands his business.

Mr. Frank X. Smith, Chief of the New York City District Attorney's Racket Bureau, made similar remarks when he testified.

Mr. Edward C. McMahon, a qualified agent employed by the Thoroughbred Racing Protective Bureau, primarily engaged in the supervision of the internal security at race tracks, gave testimony like that which he had previously given in a similar case; see *Paterson Publishing Co. v. New Jersey Bell Telephone Co.*, supra, 122 A.2d at p. 601. He said he saw no reason for anyone to want flash information of the type being disseminated by Sports Service except bookmakers and past posters. He stated that some people will place their bets only with bookmakers who will let them know immediately which horse won so that they may determine how much to bet on the next race. Tollin's suggestion that there may be instances where a person wholly unconnected with gambling operations will want immediate information as to the outcome of a race and will be willing to pay a substantial charge for this information was regarded by the Commission as virtually inconceivable. In any event, it considered such instances isolated. See also, *Paterson Publishing Co. v. New Jersey Bell Telephone Co.*, supra, 122 A.2d at p. 602. Mr. McMahon stated that no horse trainer or breeder would be interested in this flash information and that it was unlikely, as Sports Service suggests, that an owner of a horse would use this method to obtain information, especially where the customer seeks more than one result and from different tracks. Normally, a person placing a legal bet at a race track would have no need to ascertain the results of the race by resort to this service. See *Telephone News System, Inc. v. Illinois Bell Telephone Co.*, D.C.Ill., 210 F.Supp. 471, 476. In fact, it would be highly unusual for a bettor to even know the unadvertised facility exists or its telephone numbers.

The evidence before the Commission was not limited to the testimony recited. For example, the State also produced a statement signed by Albert Tollin and the late Joseph Tollin before Thomas La Venia, a special investigator for Chesapeake & Potomac Utilities Commission, Washington, D.C., and Walter J. Wassmer, formerly a State Detective with the Attorney General's office, when they visited the Tollins in Wilmington on April 14, 1958, wherein the Tollins stated:

"Our business is to get flash results to our customers before the radio and newspaper announcements. We have to do this to survive. Our services have practically no value except to bookmakers and professional bettors." Albert Tollin explained that he signed the statement to accommodate his father, who was very ill, even though he felt at the time it was incorrect. It is true that at the time he signed the statement, his father was very ill, and that he may have done it as an accommodation to his father. However, the Commission was warranted in believing that this statement was truthful. In fact, his father, who was admittedly an expert in the business, made statements similar to this before the Kefauver Committee in 1950 and in 1958 before the District of Columbia Public Utilities Commission, which investigated, among other matters, the activities of Delaware Sports Service.

Even though portions of the testimony relating to telephone analyses made by telephone companies in various states was held to be inadmissible by the Commission, some of this testimony was held to be admissible and indicated that bookmakers were using the flash service. In fact, New York witnesses testified that raids were conducted on bookmakers partially as a result of analyses of telephone calls made to Sports Service.

The probative evidence in the record in the instant case clearly shows that under the prevailing test on appeal, the Commission was more than justified in concluding that Sports Service was primarily set up to serve bookmakers by furnishing to them information essential to the conduct of their activities.

Tollin's claim that Sports Service was unfairly charged with the burden of proof is unfounded. The intervenor assumed the conduct of the hearing for Diamond State Telephone Company and presented all of its witnesses before Sports Service was required to rebut. Although the Attorney General claimed petitioner had the burden of proof, he proceeded throughout the hearing on the assumption that he and Diamond had the burden. And even though the opinion of the Commission expressed the belief that petitioner had the burden, nevertheless, it found this issue moot and decided the case on the assumption that petitioner did not have the burden.[8] Under such

---

[8]Pertinent language from the Commission's opinion, pp. 15, 16:

"In reviewing the entire record, we have concluded that the intervenor and Diamond State had made a showing that there existed in their minds an honest belief, if not a confirmed conviction, that Petitioner was using its services to further illegal gambling over a wide area, including the State of Delaware.

"At that juncture it was incumbent upon Petitioner to dispel such a belief and to demonstrate to the Commission the legitimate nature of its lucrative business. We have taken this approach in an effort to grant Petitioner the right of rebuttal rather than the burden of proof, even though in doing so we disregard the onus of primary proof which Petitioner bears. We have overlooked procedure in an effort to give Petitioner the benefit since we recognize that it comes before us unwillingly and only at judicial direction.

"It is clear to us, nonetheless, that Petitioner has not only failed to dispel the shadow of illegality that taints its operations, but has taxed the credulity of the Commission with its profession of detached ignorance of the uses being made of the information it disseminates."

circumstances, Sports Service has no right to complain.[9]

Petitioner claims that the controverted question was whether the telephone company had evidence that Sports Service was using its facilities in violation of the law, as is outlined in the tariff. Petitioner misstates the issue. The Commission did not limit itself to a consideration of the tariff provision. The issue it considered was whether or not petitioner's service was being used for gambling purposes or in furtherance of illegal gambling in violation of public policy. In its opinion, the Commission concluded: "We accordingly determine that Diamond State was justified in concluding that Petitioner was using its telephone service to promote illegal activities."

Petitioner's next argument, that defendants failed to establish the fact of illegality by a preponderance of the evidence, again misstates the issue, the question being whether or not the dissemination of news furthered illegal gambling and was against public policy. This question was determined by a preponderance of the evidence. The order of the Commission dismissing Sports Service's petition was supported by competent evidence.

The other arguments advanced by counsel for Sports Service have been considered and do not call for any different conclusion.

Petitioner's appeal denied and dismissed. Decision appealed from affirmed, and the record in the case is ordered returned to the Public Service Commission.

---

[9]Compare *Kelly v. Illinois Bell Telephone Co.*, D.C.Ill., 210 F.Supp. 456, 464; *Telephone News System, Inc. v. Illinois Bell Telephone Co.*, D.C.Ill., 210 F.Supp. 471, 475; *Rubin v. Pennsylvania Public Utility Commission*, 197 Pa.Super. 157, 177 A.2d 128, with In re Rosner, 24 Misc.2d 981, 205 N.Y.S.2d 476, 477.

On Motion for Reargument.

Petitioner's motion for reargument, filed pursuant to Superior Court Rule 59(e), *Del. C.* and its special prayers as set forth on page 3 of its motion are hereby denied.