**Dixie R. BEDSAUL, Appellant,**

**v.**

**EMPLOYMENT SECURITY COMMISSION of the State of Delaware and Chrysler Corporation, Appellees.**

Superior Court of Delaware,
New Castle.

Jan. 14, 1971.

Elwyn Evans, Jr., Legal Aid Atty., Wilmington, for appellant.

Carl Schnee, Wilmington, for employer-appellee.

STIFTEL, President Judge.

Appellant, Dixie R. Bedsaul, was denied unemployment compensation by the Claims Deputy, the Associate Referee, and the Employment Security Commission (hereinafter "Commission"). The Commission disqualified appellant for benefits under 19 Del.C. § 3315(2).[1]

Appellant was employed by Chrysler Corporation on October 21, 1964. He maintained his family in Mt. Airy, North Carolina, while he worked for Chrysler in Delaware. He had a good employment record over the course of 5½ years. Mr. Bedsaul last worked for Chrysler in Newark, Delaware, on August 11, 1969, when he became ill at work and was taken to a hospital in Elkton, Maryland. At the hospital, Mr. Bedsaul's condition was diagnosed as "functional indigestion" and he was released from the hospital on August 14, 1969. After this release, Mr. Bedsaul was driven to his North Carolina home by a foreman from his department. In North Carolina, the appellant was treated by his long time family physician, Dr. Grymes.

The attending physician at the Elkton, Maryland, hospital signed the necessary papers qualifying appellant for sickness insurance benefits until September 3, 1969, and a total of $250 was paid to him. Mr. Bedsaul did not return to Delaware on September 3, 1969 and he was notified at his Delaware living address that his sickness payments had been terminated as of September 3, 1969. On October 7, 1969, Chrysler wrote to him in North Carolina and instructed him to "report to the employment office for work and substantiate your absence from work is for proper cause on or before October 15, 1969, or your seniority will be terminated." This letter was received by Mr. Bedsaul on October 10, 1969, and he telegraphed Chrysler on October 14,

1969, that he would be at the Newark plant on the 20th of October.

Appellant appeared in Newark on October 20, 1969, and delivered a note to a Chrysler representative from Dr. Lloyd Grymes, as follows:

"Mr. Dixie Bedsaul is a regular patient of mine. His condition requires a complete rest. If he could remain off from work until the first of the year it would prove beneficial."

Chrysler sent a letter dated October 20, 1969, to Bedsaul the same date he appeared in Newark, which read as follows:

"On October 7, 1969 we sent you a letter instructing you to report for work by October 15, 1969 and substantiate your absence or your Seniority Rights would be cancelled.

"You have not reported. Therefore, your Seniority Rights are terminated in accordance with Section 62(d) of the Production and Maintenance Agreement dated November 10, 1967.

"(s) S. Shelby Brown
Employment Supervisor."

It is not clear whether the last letter was sent to Bedsaul before or after he appeared. At any rate, Mr. Coefield, the Chrysler witness, said that Chrysler refused to accept the doctor's note as proper substantiation for Bedsaul's absence.

Mr. Bedsaul returned to Newark in late January 1970 and says he ascertained that no work was in fact available for him. On February 13, 1970, he filed a claim for unemployment compensation.

After citing 19 Del.C. § 3315(2), the Commission stated:

"In our opinion, the employer's communication to the claimant ordering him either to report by October 15, 1969, or

1. 19 Del.C. § 3315(2) reads:
"§ 3315 Disqualification for benefits. An individual shall be disqualified for benefits—
* * * * *

"(2) For the period of unemployment next ensuing after an individual has been discharged from his work for just cause in connection with his work * *."

[and] [2] substantiate that his absence was due to total disability was a reasonable order. The plaintiff failed to comply with this order. In our opinion, his discharge was for just cause within the meaning of the Delaware Act."

Then the Commission stated as follows:

"Decision affirmed. Claimant was discharged for just cause in connection with his work on October 20, 1969. He is disqualified for receipt of unemployment compensation benefits for the period of his unemployment next ensuing after that date."

Was this decision supported by the evidence? See Abex Corp. v. Todd, Del. Super., 235 A.2d 271; Lockwood v. Unemployment Compensation Commission, Del. Super., 6 Terry 536, 76 A.2d 311. I think not.

The Commission rested its decision solely on Bedsaul's failure to comply with the terms of the Chrysler letter of October 7. It says the terms were reasonable and failure to comply provided "just cause" for his discharge.

Technically, Bedsaul may have failed to comply with the conditions of the October 7th letter. He did not get to Chrysler exactly on the 15th and the note he brought with him to Chrysler was not couched in the exact language that Chrysler thought necessary to fully explain his absence. There was no evidence that Bedsaul was indifferent. See Abex Corp. v. Todd, Del. Super., 235 A.2d 271, 272. On the 14th of October, he sent a telegram to Chrysler explaining that he would be in Newark on the 20th. Coefield said Chrysler expected an employee to report eight days after it sends its letter. [3] But the Chrysler letter was sent to Mt. Airy, North Carolina, not to Delaware, and from the time that Bedsaul received the letter, he had to communicate with his doctor and receive some substantiation from him to present to Chrysler. The doctor's note explaining that Bedsaul needed a complete rest and suggesting that he remain off work until the first of the year was dated October 18. It was only two days after the date of the doctor's note that he appeared in Newark with it. If the 15th was a magic date, then Chrysler, as soon as it received Bedsaul's telegram, could have written, telegraphed or telephoned Bedsaul and told him that he should get to Newark immediately or run the risk of discharge. It did not do so. It allowed him to come to Newark on the 20th and deliver the doctor's note. Chrysler appeared more interested in the substantiation of Bedsaul's absence beyond September 3 than his appearance by a specific date.

The doctor's note was imprecise. However, it did show that he was under the doctor's care and that the doctor made certain recommendations in reference to his immediate state of health. The doctor did not advise re-employment prior to January. No evidence was presented by Chrysler of Bedsaul's good health to rebut inferences of bad health suggested by the note. If Chrysler was dissatisfied with the note, it could have contacted Dr. Grymes and requested a better explanation of Bedsaul's absence and a fuller explanation of his October 15th and future medical condition. Immediately, it could have been

2. The October 7 letter to Bedsaul from Chrysler used the conjunction "and". However, in its opinion, the Commission used the conjunction "or". Also, during the course of the hearing, the word "or" was constantly used by the Chrysler representative and all the people who testified.

3. " * * * we understand that he may have a problem in getting back to work within the date that we require, so we give him some leeway, and we recognize that there is a certain amount of flexibility in this area; but when we send for a man who has been out for a period of time and has been maintaining—or that the Corporation has been maintaining communications with this man— when we send him a letter on one date and request him to report eight days later, not later than that date, we feel that if he does not report by that date, then that is ground for separation under the terms of the contract." (R. p. 27).

done by telephone. To reject the doctor's note on its merits without giving the doctor the opportunity for a fuller explanation was unfair. Chrysler's letter on the 20th of October summarily terminating Bedsaul's seniority rights suggests a special eagerness to have this fifty-four year old nervous man classified as an "ex-employee". The only reason in the October 20th letter for the termination of Bedsaul's seniority rights was because "you have not reported" by the 15th of October.

During the hearing before the Commission, a photocopy of a letter dated February 22, 1970, from Dr. Grymes to Mr. Cruesenberry, President of the Local Chrysler Union, was produced by Mr. Alsop, the Union representative present at the hearing. This letter stated:

"This patient, Mr. Bedsaul, was disabled from Oct. 18 due to nervousness."

The typewritten abbreviaion "Oct." was inked out and instead of reading "Oct.", the letters "Aug" were substituted. This note was peremptorily refused as evidence by the Commission because of the alteration and because it was a photocopy. The latter objection was raised only by the Chairman of the Commission. If the Commission considered this letter crucial to Bedsaul's case, it could have made arrangements to have the Union present the original and it could have caused an inquiry of Dr. Grymes as to the proper date.[4] There was no suggestion that the alteration was made by Bedsaul or the Union. The cross-out may have been made by Dr. Grymes himself.

For an inexplicable reason, the Commission never mentioned the doctor's certificate

purportedly signed by Lloyd Grymes, M.D., dated March 2, 1970, present in the record as an exhibit, and captioned on Employment Security Commission stationery, which explains the nature of Bedsaul's illness and that the patient was under Dr. Grymes' care from 8/15/69 to 1/19/70, and gives the date 1/19/70 in answer to Question 5, which reads:

"Give date this person was or will be able to perform the duties of his regular occupation on a full-time basis."

This certificate was attached to Bedsaul's application for compensation.

The record is most unclear. The October 7 and October 20 letters from Chrysler do not mention the word "discharge". They merely mention termination of seniority rights. The Chrysler witness stated that these terms were not synonymous. There were inferences that the Union-Company Agreement may have treated them similarly but it certainly is not clear from the record.

At another point in the record, Mr. Coefield stated that Bedsaul's failure to appear on the 15th was a resignation.[5] Obviously, no resignation was intended.

The denial of unemployment compensation benefits to Bedsaul is not supported by record evidence. The decision of the Commission is therefore reversed. This matter is remanded for further action not inconsistent with this opinion.

So ordered.

4. See In re Delaware Sports Service, Del. Super., 196 A.2d 215, 221, aff'd per cur., 202 A.2d 568, on the applicability of technical rules of evidence before Boards and Commissions.

5. "MR. ALSOP: Do you know the code under which he was terminated? "MR. COEFIELD: Yes, sir. He separated on Employment Code 18, which is

a resignation; off five days without reporting. He did not return to work when we called him to return to work. "MR. ALSOP: Oh, off five days without reporting? "MR. COEFIELD: Yes. "MR. ALSOP: What five days? "MR. COEFIELD: Well, the days from October 7th to the 15th that we told him to report." R. p. 20.