RAWLS, Chief Judge.
Appellants Stanley and Cross were charged by information with violating Florida Lottery Laws in two counts, viz.: “ * * * on the twenty-third day of November * * * did then and there unlawfully set up, promote and conduct a lottery, lottery drawing, etc.,” and in the second count “ * * * did then and there unlawfully aid and assist in the setting up, promoting and conducting of a lottery,” etc. Stanley was found guilty by a jury on both counts and Cross was found guilty of the second count. They now appeal the judgment of conviction entered upon the jury’s verdict.
The bulk of the evidence adduced at the trial concerned a lengthy investigation of Stanley’s activities during the period of time of October 31, 1963, through November 23, 1963. Stanley’s main point on appeal questions the legality of the search of his home on November 23, 1963. Therefore it is necessary that we dispose of this contention before reaching Cross’s grievances.
FACTS AS TO STANLEY
On October 29, 1963, a meeting of the Duval County sheriff’s office vice squad was held in the office of Lt. Hamlin (officer in charge of the vice squad) pertaining to an investigation of the activities of the defendants Stanley and Cross. A deputy sheriff, Sgt. Pfeiffer, was assigned with an F.B.I. agent to begin surveillance of Stanley’s activities the following morning, Wednesday, October 30th. The surveillance was maintained the balance of that week and the major portion of each succeeding Saturday until Stanley’s arrest on Saturday afternoon, November 23rd. In the last afternoon or early evening of November 22nd, Lt. Hamlin procured from a Circuit Judge in Duval County two search warrants for residences which the officers had observed that Stanley ' frequently visited on Saturdays, and in addition thereto an arrest warrant charging Stanley with violation of the lottery laws on November 16th. Lt. Hamlin retained these warrants in his possession until around 11:50 a. m. on Saturday, November 23rd. On the morning of November 23 Sgt. Pfeif-fer and an F.B.I. agent began their surveillance of Mrs. Stanley’s home at approximately 7:00 a. m., continued this surveillance during the morning, and also maintained radio contact with other members of the vice squad. It was generally known among the officers that an arrest warrant and the two search warrants had been issued on the previous day. Lt. Hamlin testified that he participated in the surveillance of Stanley during this Saturday morning and on one occasion he could have arrested Stanley by serving the arrest warrant “ * * * if I had wanted to stop my car,” and that he could have had him arrested any time during that morning. Shortly before noon, Stanley, instead of going to one of the residences for which search warrants had been procured as contemplated by the law enforcement officers, went to his own home carrying with him a young lady who assisted him in tabulating lottery data.
Between the hours of 11:30 a. m. and 12:00 noon,, a. meeting of the officers involved was held at Lt: Plamlin’s apartment, at which time it was decided that the arrest warrant would be served on Stanley at his home.
At this point we are .confronted with Stanley’s complaint about the legality of the search of his home. The law enforcement officers testified that their primary purpose in serving the arrest warrant upon Stanley was to arrest him and to conduct a search of his premises as an incident to the arrest. As is readily discernible, a full-scale raiding party was assembled to accomplish the task of serving an arrest warrant upon one individual. *900 One Bob Henry, an employee of a Jacksonville television station, had been alerted about midmorning by “someone” on the vice squad concerning the impending raid, and he joined the raiding party a short distance from Stanley’s home. A Volkswagen panel truck was utilized by the party for the purpose of catching Stanley unaware, and secreted in the rear of this truck were three members of the vice squad equipped with a tape recorder and an ax, and Mr. Henry with his television camera. One of the officers testified, “The reason we went in the truck was to get out and get inside before they burned the papers up inside used for the lottery.” The truck was driven by Sgt. Pfeiffer of the squad. Around 2:00 p. m. this group pulled into Stanley’s driveway. Sgt. Pfeiffer walked to the door of Stanley’s house carrying a brief case in which was concealed an operating tape recorder. He knocked on the door and as Stanley opened same, advised him he was under arrest. Sgt. Pfeiffer stated that he held Stanley’s hand so tight that it resulted in Stanley’s pulling him inside the house leaving the front door open. Almost concurrently with the activity at the door, the three officers in the Volkswagen converged upon Stanley’s house — one carrying the ax — and immediately began a search of the premises. The young lady who had been assisting Stanley in tabulating the lottery data fled into the bathroom, locked the door, and attempted to flush incriminating evidence down the commode. According to this young lady, the officers splintered the panel door with an ax. According to the officers, they kicked and hit the bathroom door with their bodies with such force that it splintered. At any rate, admission was gained into the bathroom and some of the paraphernalia was retrieved from the commode. All of this frenzied activity was recorded by Mr. Henry and his television camera.
It is upon the foregoing eviden-tiary background that Stanley insists that the utilization of the instant arrest warrant was a subterfuge to gain entrance into his home for the primary purpose of searching same and discovering evidence upon which a conviction could be obtained. We have no difficulty in agreeing with Stanley’s contention, and this record leads to the inescapable conclusion that the primary objective of the arrest under the circumstances of this case was the searching of Stanley’s home for which a search warrant had not been procured. That Stanley was utilizing his home for illegal purposes has been conclusively proven. However, such is not the test for the reasonableness of the instant search. If we were to sustain this search as being a lawful one, a very possible consequence would be to emasculate the safeguards established by our founding fathers in the federal and state constitutions guaranteeing to the citizens of this state the sanctuary of their homes against raiding parties. As stated in Chapman v. State, 158 So.2d 578 (Fla.App.3d, 1964):
“An incidental search should be, as the term implies, incidental to the arrest. The primary purpose should be to arrest and the search should be purely incidental to it. An exploratory search is one in which the search is primary and the arrest is used as a pretext to justify the search.”
In Prather v. State, 182 So.2d 273 (Fla.App.3d, 1966), it was held:
“Law enforcement officers may not make a valid search by entering premises ostensibly for the purpose of making an arrest but in reality for the purpose of conducting a general exploratory search for evidence of crime. Such search is unreasonable even though the arrest is supported by probable cause or a valid arrest warrant. Jones v. United States, 1958, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514; and Chapman v. State, Fla.App.1963, 158 So.2d 578.”
Having concluded that the fruits of this unreasonable search were not available as evidence against Stanley, we find that *901 Stanley’s conviction must be reversed and a new trial granted.
FACTS AS TO CROSS
The evidence as to Cross’s activities reflects that Saturday was the usual day for the conducting of lotteries. In addition to the proof that Cross sold lottery tickets on November 1 and 8, an officer testified that Cross admitted that he turned his numbers in to a man named Mars; that Mars would call him on Saturdays and ask him to take a package or envelope to Stanley; and that Cross made these deliveries. The officer further testified that he had observed Cross’s meeting with Stanley on two Saturdays, November 2 and November 9. Thus, the jury had before it positive evidence of selling lottery tickets and evidence that Cross accepted packages from a man he knew was involved in operating a lottery and delivered same during the hours and on the days normally utilized for the operation of the lottery known as Cuba. We find that this is sufficient evidence to sustain the jury verdict that Cross was guilty of aiding and assisting in the promoting and conducting of a lottery.
The judgment as to Cross is sustained.
Reversed in part and sustained in part.
CARROLL, DONALD K., and WIG-GINTON, JJ., concur.