491 F.2d 219
 NEW JERSEY STATE LOTTERY COMMISSION, Petitioner,
v.
UNITED STATES of America and Federal Communications
Commission, Respondents, Commonwealth of
Pennsylvania and State of New Hampshire,
Intervenors.
 No. 72-1878.
 United States Court of Appeals, Third Circuit.
 Argued May 15, 1973, Submitted en banc Nov. 15, 1973.
Decided Jan. 2, 1974.
 
 George F. Kugler, Jr., Atty. Gen., of New Jersey, Stephen Skillman, Alfred L. Nardelli, Deputy Attys. Gen., Trenton, N.J., for petitioner.
 
 
 1
 Thomas E. Kauper, Asst. Atty. Gen., Howard E. Shapiro, Dept. of Justice, Washington, D.C., for respondent, United States.
 
 
 2
 John W. Pettit, Joseph A. Marino, R. Michael Senkowski, Federal Communications Commn., Washington, D.C., for respondent, Federal Communications Commn.
 
 
 3
 Israel Packel, Atty. Gen., Raymond Kleiman, Deputy Atty. Gen., Harrisburg, Pa., for intervenor, Commonwealth of Pennsylvania.
 
 
 4
 David H. Souter, Deputy Atty. gen., Concord, N.H., for intervenor, State of New Hampshire.
 
 
 5
 Louis Schwartz, Robert A. Woods, Washington, D.C., for amicus curiae, The Maryland Broadcasting Commn.
 
 Argued May 15, 1973
 
 6
 Before VAN DUSEN, GIBBONS and ROSENN, Circuit Judges.
 
 
 7
 Submitted On Rehearing en banc Nov. 15, 1973.
 
 
 8
 Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.
 
 OPINION OF THE COURT
 
 9
 GIBBONS, Circuit Judge.
 
 
 10
 This case is before us pursuant to 28 U.S.C. 2342(1) and 47 U.S.C. 402(a) on the petition of New Jersey State Lottery Commission to review a declaratory ruling of the Federal Communications Commission. Proceedings before the FCC commenced in February 1971 when Jersey Cape Broadcasting Corporation, a licensee of broadcast frequencies operating in Wildwood, New Jersey, filed a request for a declaratory ruling on the question whether its broadcast of the winning weekly number in the New Jersey State Lottery would violate 18 U.S.C. 1304. Jersey Cape proposed to broadcast, during three consecutive regular news broadcasts on each Thursday, the day of the lottery drawing, and at no other time, a statement:
 
 
 11
 'The winning state lottery number drawn today is (and then recite the winning number).'
 
 
 12
 In its declaratory ruling issued July 14, 1971 the FCC ruled that the proposed statement would violate 18 U.S.C. 1304 and the FCC's rules interpreting that statute. 36 Fed.Reg. 13813 (1971). In a second ruling on July 27, 1971 the FCC made clear that its ruling prohibited the statement even as a news item in a regular news broadcast. 36 Fed.Reg. 14347 (1972). Thereafter petitioner New Jersey State Lottery Commission, pursuant to 47 U.S.C. 405[1] filed with the FCC a timely petition for reconsideration. The FCC decision before us denied this petition for reconsideration. In re Jersey Cape Broadcasting Corp., FCC 72-702, filed July 27, 1972. The Lottery Commission filed a petition for review of the July 27, 1972 Memorandum and Order in this court within the time permitted by the statute.[2] 47 U.S.C. 402(c), 405.
 
 
 13
 Before the FCC the Lottery Commission established its status as a person aggrieved or whose interests would be adversely affected. The State Lottery is authorized by a 1969 amendment to the state constitution and by the State Lottery Law, N.J.Stat.Ann. 5:9-1 to 5:9-25. The Lottery Commission commenced sale of lottery tickets in December 1970. The winning number is drawn every Thursday morning. The Lottery Commission claims that each Thursday it is confronted with a difficult problem in coping with the public demand for information of the winning number. Its telephone service was temporarily suspended on August 19, 1971, due to an overload of telephone calls. Records of the New Jersey Bell Telephone Company indicate that its twelve automatic answering and announcement machines in Newark, specially installed for the Lottery Commission to announce the winning numbers to callers in the northern half of New Jersey, receive an average of 5,500 calls between the hours of 9:30 a.m. and 2:30 p.m. on Thursdays. Five additional machines have been installed in Newark. In addition to the calls completed, 32,000 and 63,000 'overflow' calls were attempted on August 12 and August 19, 1971, respectively. Many phone calls requesting the winning lottery number have also been made to newspapers throughout the state commencing at approximately 11:30 a.m. on Thursdays. On a typical Thursday, 2,750,000 ticketholders are interested in the winning number.
 
 
 14
 The FCC, in issuing the challenged ruling, acted pursuant to the Communications Act of 1934. See Act of June 19, 1934, ch. 652, 48 Stat. 1064, 1086, 1088, 1091. The provisions of that statute relevant to this case are found at 18 U.S.C. 1304, 47 U.S.C. 312(a)(6) and 47 U.S.C. 326. 18 U.S.C. 1304 provides:
 
 
 15
 'Whoever broadcasts by means of any radio station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined not more than $1,000 or imprisoned not more than one year, or both.
 
 
 16
 The FCC can under 47 U.S.C. 312(a)(6) revoke any station license for a violation of 18 U.S.C. 1304. 47 U.S.C. 326 provides:
 
 
 17
 'Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.
 
 
 18
 In its ruling the FCC made no effort to reconcile the three statutory provisions. Relying entirely on 18 U.S.C. 1304, on its Supplementary Declaratory Ruling, 21 F.C.C.2d 846 (1970), and on the decision of the Second Circuit in New York State Broadcasters Association v. United States, 414 F.2d 990 (2d Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (which does not discuss 47 U.S.C. 326), the FCC held that it had authority to prohibit a broadcast frequency licensee from announcing the winning lottery number as a news item in a regular news broadcast.[3] We conclude that the FCC misconstrued the congressional mandate in the Communications Act of 1934. Nothing in that statute was intended to permit the exercise by the FCC of control over editorial decisions of broadcast journalists. On the contrary as 47 U.S.C. 326 makes clear, Congress expected the FCC's actions to be consistent with the first amendment.
 
 
 19
 The FCC ruling imposes a small prior restraint. It is, nonetheless, a prior restraint upon the dissemination of information of interest, on the day of the lottery, to perhaps 58% Of New Jersey's adult population. There are three possible justifications for such a restraint. One is that the information is of such nature that it is not protected by the first amendment. E.g., Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973) United States v. 12 200-Ft. Reels of Super 8mm. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973). The second is that although the information ordinarily is protected by the first amendment, the agency applying the restraint is exempt from its strictures. E.g., Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). The third is that although the information is protected and the agency is not exempt from the first amendment, the restraint is only reasonably incidental to the achievement of another valid governmental purpose. E.g., Veterans and Reservists for Peace in Vietnam v. Regional Commissioner of Customs, 459 F.2d 676 (3d Cir.), cert. denied, 409 U.S. 933, 93 S.Ct. 232, 34 L.Ed.2d 188 (1972).
 
 
 20
 The FCC does not urge the third justification; indeed 18 U.S.C. 1304, as interpreted in the proceeding under review has no purpose other than restraint upon the dissemination of information. The FCC does, however, urge both of the other justifications. In its initial decision on petitioner's request for a ruling, it held that the winning lottery number was not 'news' and therefore was not protected by the first amendment. When the Lottery Commission petitioned for reconsideration, it held that even if the winning number had some news value to some persons, its broadcast would directly promote a lottery, and could therefore be prohibited by the FCC. On both grounds the FCC is wrong.
 
 
 21
 The contention that on Thursday afternoon the winning number in the New Jersey lottery is not 'news', in a broadcast context, is simply frivolous. In Rosenbloom v. Metromedia, Inc., 415 F.2d 892 (3d Cir. 1969), aff'd, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), we stressed the 'hot news' value of broadcast news summaries given in hourly or half-hourly reports, and said:
 
 
 22
 The primary value of these items to the public is in conveying the latest news as promptly as possible so that it has the opportunity to be informed of news items of possible immediate public concern. Id. at 895.
 
 
 23
 On Thursday afternoon and evening the winning lottery number is 'hot news'. By Friday afternoon it is merely history, with which broadcast journalism is only peripherally concerned. The FCC reasons that because the winning number is of interest to only a limited class of persons (a mere 2,750,000 ticketholders on a typical Thursday), it is not an item of news, and hence is not protected information. Setting aside the question whether the first amendment recognizes a distinction between news and mere history, see, e.g., Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948), we reject the premise that the size of the class of persons interested determines what is news. If this were the determinant, stock market quotations would not be news and, hence, apparently could be censored, since on any given Thursday more persons in New Jersey are interested in the winning lottery number than in the closing price of any given security. If this were the determinant, most obituaries would not be news; the arrivals of out-of-town buyers in the clothing market would not be news;[4] the expected time of arrival of a steamship would not be news.[5] The first amendment makes clear that it is beyond the competency of any governmental agency to determine, a priori, that any item of information is, for any news medium, not news.
 
 
 24
 Broadcast news media, because of the immediate and highly transitory nature of their news coverage, present particular problems in this regard. They, above all news media, serve the public need to be informed on what is of immediate though of passing interest. They at least as much as the other news media should be left free to make their own editorial decisions as to what news will best serve their public. The only restraints on information by which, in the news context, the broadcast media may constitutionally be bound are those imposed by what little is left of the law of libel since New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny, and by the law of obscenity, e.g. Miller v. California, supra; Paris Adult Theatre I v. Slaton, supra; United States v. Orito, supra; Kaplan v. California, supra; United States v. 12 200-Ft. Reels of Super 8mm. Film, supra; see 47 U.S.C. 303(m)(1)(D). Clearly the winning lottery number is, on Thursday afternoon, press information protected by the first amendment.
 
 
 25
 Is the FCC, then, an exempt agency? To put the question conversely, does the circumstance that broadcasters are licensees of the federally owned broadcast frequencies make them, in the news context, subject to prior governmental restraints?
 
 
 26
 We can set to one side those cases dealing with a broadcaster's commercial activities. We assume for present purposes that Congress may constitutionally condition the grant of a license to use the federally owned broadcast frequencies upon an agreement by the licensees that they will disclose payments for broadcast information, 47 U.S.C. 317, and that they will not, by the use of those frequencies, derive revenue from promotion of products or activities deemed by Congress unworthy of such promotion. See Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082, 1101-1103 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); 15 U.S.C. 1331-1339; CF. PITTSBURGH PRESS CO. V. PITTSBURGH COmmisSIon on humaN relaTions,413 U.S. 376, 93 S.Ct. 2553, 35 L.Ed.2d 669 (1973). We assume, as well, that Congress may condition the grant of exclusive licenses to use the limited available number of broadcast frequencies upon reasonable agreements by the licensees designed to assure fair access of competing ideas to those frequencies. See 47 U.S.C. 315; Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Compare with Columbia Broadcasting System, Inc. v. Democratic National Committee,412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). This case, however, falls in neither category. Jersey Cape Broadcasting Corporation seeks no more than to include in its regular news broadcasts on Thursday a news item of immediate, though transitory, interest to 2,750,000 persons. If Congress may condition the grant of a license upon submission to prior restraint against broadcast of this news item, how would one distinguish a condition imposing a prior restraint on the broadcast of stock market or commodity future prices, or indeed of any subject matter? We think it clear from 47 U.S.C. 326 that in enacting the Communications Act of 1934 Congress, while exercising its plenary power to license use of broadcast frequencies, did not claim, directly or by implication, any power to impose conditions on the grant of such licenses which would violate the first amendment. The FCC interpretation of 18 U.S.C. 1304 gives that provision of the Communications Act of 1934 undue weight while giving too little weight to the Congressional expression in the same statute set out in 47 U.S.C. 326. The latter provision negates any intention on the part of Congress to make 18 U.S.C. 1304 applicable to news broadcasts. A logical reconciliation of the two sections, and one which avoids a serious constitutional difficulty, restricts the application of 18 U.S.C. 1304 to promotion of lotteries for which the licensee receives compensation. But cf. New York State Broadcasters Association v. United States, supra. Possibly, as Judge Feinberg suggests in New York State Broadcasters, some uncompensated promotional announcements outside the context of broadcast journalism might be found by the FCC to be promotional, and not news, and hence prohibited by 18 U.S.C. 1304. We need not decide that issue in this case. , the announcements here involved are unadulterated broadcast journalism-- news-- and clearly are protected by 47 U.S.C. 326 and the first amendment rather than prohibited by 18 U.S.C. 1304.
 
 
 27
 The petition for review will be granted and the ruling of the FCC will be reversed.
 
 
 
 [1]
 47 U.S.C. 405 provides:
 'After an order . . . or action has been made or taken in any proceeding by the Commission . . . any other person aggrieved or whose interests are adversely affected thereby, may petition for rehearing . . ..'
 The FCC does not challenge the Lottery Commission's standing.
 
 
 [2]
 By order dated November 3, 1972, we granted motions of the states of New Hampshire and Pennsylvania to intervene as petitioners. The Maryland Public Broadcasting Corporation has filed a brief as amicus curiae in support of the petition for review
 
 
 [3]
 Compare this position with In re Broadcasting of Information Concerning Horse Races, FCC 73-355, filed April 3, 1973
 
 
 [4]
 See New York Times weekly report
 
 
 [5]
 See New York Times daily report