RAWLS, Acting Chief Judge.
“An incidental search should be, as the term implies, incidental to the arrest. The primary purpose should be to arrest and the search should be purely incidental to it. An exploratory search is one in which the search is primary and the arrest is used as a pretext to justify the search.”[1]
A review of this record leads us to the inescapable conclusion that the search conducted subsequent to arresting Scott was primarily exploratory and not as an incident of the arrest.
On March 16,1976, Deputy Sheriff Markham was looking for Scott for the purpose of executing two capiases. Pursuant to information received from an informer, Markham, in the mid-morning, traveled to an apartment complex and, upon arrival at *115 same, observed Scott and an unknown male at the rear of an apartment. Markham also observed a sliding glass door open in an apartment; a 1967 Pontiac backed up to same; and a television set being deposited in the trunk of the automobile. No explanation was offered by Markham as to why he did not serve Scott at this point in time. Markham then followed the Pontiac which proceeded westbound, during which period of time he maintained “a moving surveillance of the vehicle”. Again, no attempt was made to apprehend Scott, execute the capias and effectuate an arrest. Loss of visual observation of Scott in his motor vehicle occurred when Markham “changed his location”.
Markham then advised other officers that he felt that Scott was residing at the apartment complex. Investigator DeCase and other officers were seeking an unidentified man with a scorpion tatoo on his arm who reportedly was an associate of Scott’s. Wayne Mack, Criminal Warrants Investigator, testified that numerous persons “were involved in this thing”, and they asked his assistance in apprehending Scott for the purpose of arresting him on the outstanding felony capias. Around 4:30 in the afternoon, Mack and several other officers began a surveillance of Scott’s apartment. Mack testified that around 7:45 p. m. these officers observed the Pontiac in front of the apartment, at which time “we broke up— some deputies went to the back, I went to the front door with a couple”. Mack and his deputies gained entry into the living room, searched Scott and another male that was with him, and handcuffed Scott. In the meantime, the other deputies spread throughout the apartment with at least one officer in each room. A request to Scott for permission to search the apartment was refused by him. Some weapons (not admitted into evidence) were found in the singular bedroom. Approximately an hour and a half later, Deputy Markham arrived at the apartment solely “for the purpose of effectuating an arrest”. Upon being advised by others that weapons had previously been seized from the bedroom, Markham “traveled through the structure for the purpose of securing any additional weapons for my safety and my fellow officers’ safety”. He then looked into a closet that was open and seized shoulder weapons from the closet. These were located in a room adjacent to the living room area where the occupants of the apartment had been in custody for at least an hour. From the bedroom area, Markham traveled back out to the hall area where he found another closet door open and observed some C.B. radios which were the subject matter of this motion to suppress. Deputy Markham testified that he “felt that I was within my rights as functioning as a police officer in seizing these items for continuing my investigation.” Another officer testified that after the firearms and C.B. sets had been seized, he contacted an investigator of the state attorney’s office and inquired as to procuring a search warrant, and was advised that “I did not need a search warrant in order to seize any property in the apartment that — as long as it was in plain view.”
The sole reason given by this “raiding party” to search Scott’s apartment is that of effectuating the service of the capias for Scott’s arrest. As above related, ample opportunity for carrying out this mission was available to Deputy Markham during the morning hours of the subject date. The entrance to Scott’s residence and occupation of each room by the officers was carried out in a “search warrant” manner — not that of effectuating Scott’s arrest which was accomplished within a minute after entrance was gained. That Markham, arriving more than an hour later, in “traveling around the apartment”, found contraband in “plain view” is not surprising.[2] The “plain view” doctrine is not a substitute for procuring a search warrant through the auspices of a detached magistrate. This court in Stanley v. State, 189 So.2d 898 (Fla. 1st DCA 1966), and our sister court in O’Neil v. State, 194 *116 So.2d 40 (Fla. 3rd DCA 1967), have fully explored this subject and, pursuant to these authorities, we hold that the trial court erred in not granting Scott’s motion to suppress.
The judgment appealed is reversed with directions that a new trial be granted.
SMITH and ERVIN, JJ., concur.

. Chapman v. State, 158 So.2d 578 (Fla. 3rd DCA 1963).

. Appellee advises in its brief: “That his [Scott’s] closet was open, with contraband in plain view, was but a fortuitous and inadvertent result of the cursory search for other persons.”