The MEGAPHONE COMPANY, etc.,
et al., Plaintiff,

v.

SOUTHERN BELL TELEPHONE AND
TELEGRAPH COMPANY, etc.,
Defendants.

No. 86–842–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 3, 1986.

Denis L. Durkin, Robert Genzman, Baker and Hostetler, Orlando, Fla., for Megaphone.

Scott D. Baker, Jonathan S. O'Donnell, Horwich & Warner, San Francisco, Cal., for Statistical.

Maxine M. Long, Shutts and Bowen, Miami, Fla., for defendants.

FINDINGS OF FACT AND CONCLU-
SIONS OF LAW AND FINAL
JUDGMENT IN FAVOR OF PLAINTIFF

HOEVELER, District Judge.

THIS CAUSE having come before the Court for hearing and the Court having heard argument of counsel and having reviewed the submissions, and being otherwise advised in the premises, hereby enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

The Plaintiffs, The Megaphone Company and Statistical Phone Information, and the Defendant, Southern Bell Telephone and Telegraph Company, by and through their respective attorneys, have filed a Stipulation of Facts pursuant to this Court's instructions of May 20, 1986.

The parties have stipulated to the following facts:

1. At all relevant times, Plaintiff, The Megaphone Company ("Megaphone"), has been a limited partnership organized and existing under the laws of the State of California with its principal place of business in California. None of the partners of Megaphone is a citizen of the State of Georgia.

2. At all relevant times, Plaintiff, Statistical Phone Information ("Statistical"), has been a general partnership organized and existing under the laws of the State of New York. None of the partners of Statistical is a citizen of the State of Georgia.

3. At all relevant times, Defendant, Southern Bell Telephone and Telegraph Company ("Southern Bell"), has been a public communications utility company, in-

corporated in the State of Georgia, with its principal place of business in Georgia, and at all relevant times Southern Bell has been doing business in the State of Florida within the Southern District of Florida.

4. Southern Bell is a regulated public utility rendering telephone communications services in portions of the State of Florida. Southern Bell's services to its subscribers are regulated, *inter alia,* pursuant to a system of state supervision primarily set out in Chapters 350 and 364 of the Florida Statutes and Chapter 27 of the Florida Administrative Code. Under these provisions, the agency with exclusive rate and regulatory authority over Southern Bell's intrastate operations in the State of Florida is the Florida Public Service Commission ("PSC").

5. In 1984, the PSC approved a new section of Southern Bell's General Subscriber Service Tariff ("GSST") which provided for Local Dial-It service in the State of Florida on the 976 exchange (hereinafter referred to as "976 Service"). This 976 Service is an exchange service offering, which permits a caller to reach a recorded announcement by dialing a special local number. Southern Bell provides only a transport for Local Dial-It service calls. The subscriber provides the necessary announcement equipment and is solely responsible for the content of the messages published on the recorded announcements. The subscriber sets the charge to the caller, but the charges are billed and collected by Southern Bell for a fee charged to the subscriber.

6. The subscriber's control over message content is subject to the provisions of the Local Dial-It tariff. Section A13.18.-1(A.13) of the GSST provides in pertinent part:

> The subscriber shall exclude from the message or announcement any matter, the dissemination of which is prohibited by law.... The dissemination of such messages by the subscriber shall be grounds for immediate discontinuance of their subscriber service and the company

shall have no liability as a result of its action in this regard.

7. The Dial-It tariff does not require review of message content. Southern Bell, however, requires as part of its Program Review Procedure that transcripts of all message be furnished for its review prior to establishing Dial-It service for any subscriber. The Program Review Procedure also requires that the subscriber submit copies of advertising used to promote the service.

8. In the last week of December, 1985, Matt Chin of Megaphone contacted Carol Johnson of Southern Bell regarding a proposed new Dial-It program which Megaphone wished to offer in Miami. Chin advised Johnson that the program would report results of lotteries in other jurisdictions. Chin was advised that Megaphone would have to submit a script of the program to Southern Bell for review pursuant to Southern Bell's Program Review Procedure. Chin requested a start-up date of January 15, 1986, for this new program.

9. On or about December 31, 1985, Megaphone submitted a written request, followed by a formal application dated January 6, 1986, to operate a Dial-It line for government-operated lottery results announcements and other information, all in Spanish, and Southern Bell received this application on January 8, 1986. Megaphone already operated a number of other Dial-It lines.

10. Before and after submitting its application, Megaphone had several telephone conversations with various employees of Southern Bell, in which the substance of Megaphone's message was discussed, and in which Megaphone was advised of Southern Bell's concern over the legality of the proposed message, in view of Florida's public policy and statutory provisions prohibiting lotteries.

11. On January 11, 1986, Megaphone sent Southern Bell an actual Spanish-language script of the typical daily pre-recorded message which it would play on its Dial-It line. This script was received by Southern Bell on January 16, 1986.

12. The English translation of the sample script submitted by Megaphone is as follows:

William Morales was convicted in the United States for charges of arms and explosives. He was sentenced to eight years for killing a policeman in Mexico when he illegally entered that country from Puerto Rico.

The sentence is due to an accusation of illegal entry in Mexico right after his escape in January 1980 of a [sic] prison in Belleview Hospital in the city of New York. The informative source said that the jury has not specified the number of years for each accusation.

The lucky numbers of the Puerto Rico Lottery for today, Wednesday, January 8th are: 1) 27428; 2) 18195; 3) 45134; 4) 32415; 5) 0088.

13. On or about January 15, 1986, Megaphone and Statistical entered into a written agreement whereby Megaphone retained and engaged Statistical to prepare and transmit pre-recorded messages for use on the Dial-It line in return for a share of the proceeds collected for Megaphone by Southern Bell.

14. On or about January 15, 1986, Megaphone and Statistical commenced operation of their Dial-It line and began to play pre-recorded messages in Spanish which report, among other information, the results of the official and legal lotteries in the Commonwealth of Puerto Rico, the Dominican Republic and the State of New York. The nature and content of daily broadcasts played on plaintiffs' line were identical to that previously submitted to Southern Bell and have not changed since Southern Bell established service of the line, other than to update the lottery results and other information reported each day.

15. On January 23, 1986, Southern Bell's legal department completed its review of a translation of the Spanish language message received on January 16, 1986, from Megaphone. Southern Bell notified Megaphone on the same date that in its legal opinion the script could be deemed a violation of the Florida lottery statute, and asked Megaphone to voluntarily withdraw the 976 announcement of lottery results.

16. Southern Bell advised Megaphone by letter dated March 10, 1986, that Southern Bell would have to terminate Megaphone's Dial-It service as of May 1, 1986, because its message content appeared to be in violation of Florida law.

17. The Dial-It line has been operating continuously since January 15, 1986.

18. The Dial-It line reports, among other information, the results of lotteries which are legal where they are held, and neither Megaphone nor Statistical has any economic interest in such lotteries.

19. None of the parties has ever been instructed by any governmental agency to terminate the Dial-It line, nor has any party been threatened with criminal prosecution for any violation of Florida Statutes, Section 849.09.

20. Southern Bell contends plaintiffs' message and use of the Dial-It line do not comply with the terms and conditions of the Tariff and/or violate Florida Statutes, Section 849.09, and/or that termination of service is otherwise justified.

21. Megaphone and Statistical contend their pre-recorded message and use of the Dial-It line comply with the terms and conditions of the Tariff and do not violate Florida Statutes Section 849.09 and that Southern Bell cannot lawfully terminate its service.

## CONCLUSIONS OF LAW

The Court held a hearing on Plaintiffs' Motion for Preliminary Injunction, after which the Defendant agreed to withhold termination of service to Plaintiff Megaphone pending the declaratory judgment of the Court. The issue before the Court is whether the Plaintiffs' telephone messages violate the provisions of § 849.09, Fla. Stat.(1985). The statute provides in pertinent part:

(1) It is unlawful for any person in this state to:

(a) Set up, promote, or conduct any lottery for money or for anything of value;

\*   \*   \*   \*   \*   \*

(c) Conduct any lottery drawing for the distribution of a prize or prizes by lot or chance, or advertise any such lottery scheme or device in any newspaper or by circulars, posters, pamphlets, radio, telegraph, telephone or otherwise;

(d) Aid or assist in the setting up, promoting, or conducting of any lottery or lottery drawing, whether by writing, printing, or in any other manner whatsoever, or be interested in or connected in any way with any lottery or lottery drawing;

(e) Attempt to operate, conduct, or advertise any lottery scheme or device;

\*   \*   \*   \*   \*   \*

(h) Have in his possession any lottery ticket, or any evidence of any share or right in any lottery ticket, or in any lottery scheme or device, whether such ticket or evidence of share or right represents an interest in a live lottery not yet played or whether it represents, or has represented, an interest in a lottery that has already been played;

(i) Aid or assist in the sale, disposal, or procurement of any lottery ticket, coupon, or share, or any right to any drawing in a lottery; ...

These provisions are to be liberally construed, as provided by Florida Statutes, Section 849.46:

*Exercise of police power.* It is deemed by the Legislature that this chapter is necessary for the more efficient and proper enforcement of the statutes and laws of this state prohibiting lotteries and gambling, and a lawful exercise of the police power of the state for the protection of the public welfare, health, safety and morals of the people of the state. All the provisions of this chapter shall be liberally construed for the accomplishment of these purposes.

Plaintiffs contend that their messages are not illegal under the statute. Their position is that they, through their messages, are not setting up advertising, aiding or assisting, promoting or conducting any lottery, and are not interested in or connected with any lottery. Plaintiffs assert that they are not economically interested in and have no official connection with the operation of the lotteries themselves. Plaintiffs are, they contend, simply reporting the results of state lotteries which are legal in the jurisdictions in which they are held, but not in Florida. Plaintiffs state that their after the fact reporting of the results, which are often publicly available in newspapers and on television, is more properly characterized as news than lottery promotion.

Moreover, Plaintiffs aver, the Defendant's belief that the recorded messages are in violation of § 849.09 is not reasonable. Plaintiffs observe that the notice of termination of service was not prompted by a request from a law enforcement agency. Further, Plaintiffs state that the Defendant has not shown any causal connection between the information disseminated by their recorded messages and criminal violations of § 849.09. Plaintiffs contend that the Florida case law involving violations of the anti-lottery statute shows that the statute is aimed at those directly involved in some capacity with illegal lotteries in Florida. Plaintiffs contend that Defendant's interpretation of the statute is unwarranted and overbroad as applied to their service.

Defendant contends that the tariff imposed upon it by the Public Service Commission prohibits it from disseminating illegal material or material which is against public policy. Because § 849.46 compels a liberal construction of § 849.09, Defendant argues, it is justified in terminating Plaintiffs' service based upon its application of the statutes to the factual circumstances.

Defendant reasons that only persons holding lottery ticket(s) would be interested in the results disseminated by Plaintiff Megaphone. In Florida, possessing a lottery ticket is a lesser included offense under the more general statutory violation of promot-

ing a lottery. *State v. Anderson,* 270 So.2d 353 (Fla.1972); *Nelson v. State,* 83 So.2d 687 (Fla.1955). Since Plaintiffs' service caters to persons who are violating § 849.09, Defendant argues, that service is itself violative of § 849.09(d) because it furthers or is connected to lotteries. Defendant maintains that it may not furnish Dial-It service to Plaintiffs if such service causes it to violate its General Subscriber Service Tariff. *See* Stipulation of Facts, paragraph 5, *supra.*

## DISCUSSION

This Court is in agreement with Plaintiffs' contention that the Florida cases construing anti-lottery and anti-gambling statutes do not compel a finding that Plaintiffs' service is illegal.

In *Hagerty v. Coleman,* 133 Fla. 363, 182 So. 776 (Fla.1938), the appellant distributed information concerning sporting events to his customers over the telephone for compensation. The Sheriff of Dade County seized his equipment. Appellant attempted to obtain injunctive relief to prevent further seizure of the telephone equipment. The Sheriff alleged that Appellant's main business was that of procuring and transmitting horse racing information to bookmakers. It was further alleged that because the telephone was used by bookmakers to obtain the results of the horse races, the telephone was thus employed in the commission of a felony, that of operation of a gambling house.

In reversing the lower court's denial of injunctive relief, the Florida Supreme Court held that "it was the use which patrons of a telephone company made of the service rather than the act of furnishing it that constituted a crime if one was committed...." *Id.* at 777. The court further held that "[i]n the case at bar, the appellant does not use the information he collects for any purpose, he merely secures it and sells it to his subscribers for an agreed compensation ... If there is an offender, it would seem to be the 'bookies' or the 'bookmakers'...." *Id.*

In the case *sub judice,* there has been no evidence that shows that Plaintiffs' main customers are bookmakers. There is nothing on the record that shows that Plaintiffs are themselves officially connected with or economically interested in the lotteries themselves. The record does contain affidavits submitted by employees of Plaintiff Megaphone which state that Plaintiffs are not interested in or connected with the lotteries. This case appears to be similar to *Hagerty, supra,* in that Plaintiffs here furnish a service that might be of use to persons who violate the Florida anti-lottery statute, but do not themselves violate the anti-lottery statute. *Accord Pennsylvania Publications v. Pennsylvania Public Utility Commission,* 349 Pa. 184, 36 A.2d 777, 779 (1944) (case involving scope of Pennsylvania law that made it unlawful for a utility knowingly to furnish a private wire for use in the dissemination of information in furtherance of gambling; court held that public service "companies are not justified in refusing service to persons engaged in legitimate enterprises merely because such subscribers may furnish information over their facilities which may enable others receiving it to use the same illegally.")

In *Tracy v. Southern Bell Telephone & Telegraph Co.,* 37 F.Supp. 829 (S.D.Fla. (Jacksonville) 1940), plaintiff sought to enjoin defendant telephone company from terminating phone service. The telephone company had been notified by both the Attorney General and the State Attorney that the plaintiff subscribers were using the telephones for processing and booking unlawful wagers on horse races. In *Tracy,* the plaintiffs conceded that the defendant phone company had probable cause to believe that its services were being used unlawfully by plaintiffs. The probable cause came from the demands of the Attorney General and the State Attorney that the telephone service be discontinued. In the instant cause, no law enforcement agency has requested that Plaintiffs' telephone service be discontinued. Further, the telephone company has no other cause to believe that Plaintiffs are doing anything unlawful. Finally, Plaintiffs here vehemently

deny that their service is in violation of any Florida statutes.

In *Nelson v. State,* 83 So.2d 687 (Fla. 1955), the Florida Supreme Court affirmed appellant's convictions for possessing lottery tickets and selling chances, which were lesser included offenses embraced within the laws against promoting the lottery and having an interest in or connection with the lottery. Nelson was involved with a lottery known as Cuba or bolita. In the *Nelson* case, the appellant-defendant was found to have been directly and personally involved in promoting the lottery through possession of the lottery tickets. Further, Nelson was shown to have had a connection with or interest in the lottery through the sale of tickets. There was a direct connection between Nelson's sale of bolita tickets and the bolita; the bolita requires for its operation the sale of tickets. Without ticket sales, there is no lottery. The role of the ticket salesman is an indispensable one in the promotion and operation of the lottery. In contrast, Plaintiffs in the instant cause have no integral role in the operation of the lotteries. The record does not show nor does common sense dictate that the *post facto* reporting in Florida of results of government-operated lotteries which are lawful in other jurisdictions is indispensable to or typical of the operation of such lotteries. The Dominican, New York and Puerto Rican lotteries operated before the Dial-It service was introduced and could continue to operate if Plaintiffs' service was terminated by Defendant. The lotteries in this cause do not depend upon or require Plaintiffs' service in order to operate, unlike bolita and the salesmen of bolita tickets.

In *Stanley v. State,* 189 So.2d 898 (Fla. 1st DCA 1966), the court sustained the conviction, for aiding and assisting in the promotion and conducting of a lottery, of a seller of tickets for the lottery known as Cuba. The evidence showed that the defendant Cross personally sold lottery tickets and made deliveries of packages and letters for a man he knew was involved in operating a lottery during the normal hours for conducting the lottery. The ac-

tions of the defendant in *Stanley, supra,* and the Plaintiffs are completely dissimilar. Plaintiffs here lack any intent to violate the statutes. Their service does not advertise any lottery or inform callers how or where to obtain tickets for any lottery. The Plaintiffs' recorded message simply advises the caller of results of a particular lottery and gives dates on which other results will be available. While the message heard by the Court on August 5, 1986, at 3:55 p.m., consisted only of rapidly delivered lottery results as described above, such a message cannot be said to promote or advertise a lottery in the sense of furthering or encouraging the growth of or a person's participation in a lottery. Only a strained interpretation of Plaintiffs' messages would yield the conclusion that such messages "stimulat[e] ... demand for the product or activity through advertising on behalf of those who would profit from such increased demand." *See Posadas de Puerto Rico Associated v. Tourism Co. of Puerto Rico,* —— U.S. ——, 106 S.Ct. 2968, 92 L.Ed.2d 266, (1986).

Based upon a review of the relevant Florida cases cited by the parties, it does not appear that the Plaintiffs' transmissions are the kinds of things targeted by the statutes. The bolita cases reviewed by the Court, *Nelson, Stanley* and *Anderson, supra,* concern persons directly and integrally involved in the operation of underground illegal lotteries in Florida. The persons charged in each of these cases actually sold tickets, received payments, made deliveries of lottery-related paraphernalia or placed bets telephonically, all in furtherance of the lottery. None of these cases involve the *post facto* dissemination of the results of lotteries. The *Hagerty* case, concerning the distribution of horse race results, calls for the result sought by Plaintiffs, which is a declaration that their present activities do not violate §§ 849.09 and 846.46.

Defendant relies on Attorney General Opinion 074.14, January 9, 1974, to support its contention that Plaintiffs' messages are violative of § 849.09. The opinion stated that is unlawful for a newspaper or any

other medium to publish an advertisement which promotes a lottery in Florida, regardless of whether the lottery is legal in another jurisdiction. However, as discussed above, Plaintiffs' messages are not advertisements for and do not promote the Dominican, New York or Puerto Rican lotteries. Plaintiff's messages do not enable or encourage Florida residents to participate in foreign lotteries. While it is true that Plaintiffs' results service depends upon the existence of the lotteries, any connection between such lotteries and the service that provides their results to callers is so removed from the operation of the government-sponsored lotteries as to be outside the purview of the statute. If Defendant were to show that Plaintiffs' messages facilitated any sort of "satellite" lottery, i.e., an illegal lottery in Florida that featured winning numbers which corresponded to the winning numbers in one of the legitimate lotteries discussed above, then its position would be a justifiable one. No such showing, however, has been made by Defendant or any law enforcement agency of this State.

A review of the other caselaw cited by the parties does not change the Court's finding that Plaintiffs' messages are not illegal under the Florida statute. In *New Jersey State Lottery Commission v. United States*, 491 F.2d 219 (3d Cir.1974), the court reversed an FCC ruling that a broadcast of the winning number in the New Jersey State Lottery would violate 18 U.S.C. § 1304, which prohibited the broadcasting of any advertisement of or information concerning any lottery. The Third Circuit Court of Appeals held that the winning lottery number represented news of immediate though transitory interest to a certain class of persons. In permitting the information to be broadcast, the court restricted the application of the statute to the promotion of lotteries for which the broadcaster received compensation. *Id.* at 224. Plaintiffs in the instant cause do not receive compensation from the operators of the lotteries in question; thus, insofar as the Florida anti-lottery statute is similar in aim to the FCC statute challenged in *New*

*Jersey State Lottery Commission, supra,* the Plaintiffs' messages are not violative of the Florida statute.

Defendant relies on *In Re Delaware Sports Service*, 196 A.2d 215, 219 (Del.Super.Ct.1963), for its contention that it may discontinue service where it is reasonably satisfied that such service is being utilized by its customer in violation of an anti-lottery statute, a published tariff, or against public policy. In the *Delaware Sports Service* case, the telephone company was contacted by the Delaware Attorney General's office, which requested that the sports service's telephone service be discontinued. Further, the Delaware Public Service Commission rendered a written opinion, after a hearing on the merits, concluding that the sports service was primarily set up to serve bookmakers by furnishing them with information essential to their activities. The Public Service Commission's decision was based upon extensive testimony and evidence, including a statement of the sports service's proprietor which supported the Attorney General's position. In the instant cause, no Florida law enforcement agency has requested termination of Plaintiffs' telephone service, nor has the Court heard any evidence in support of Defendant's position.

In sum, the Court hereby renders its declaratory judgment in favor of Plaintiffs. The Plaintiffs' messages as disseminated through Defendant's Dial-It service are not violative of § 849.09, Fla.Stats.(1985). This finding and judgment is expressly conditioned upon Plaintiffs' messages remaining substantially the same as represented in the pleadings before the Court and as discussed above. Additional information in the telephone messages relating to the lotteries could dramatically change the result reached by this Court. Therefore, this judgment is based upon the messages' content, which is strictly limited to *results* of lotteries, remaining as described in the stipulation and opinion herein. *See Kelly v. Illinois Bell Telephone Co.*, 325 F.2d 148, 153 (7th Cir.1963). This opinion does not seek to limit or restrict the content of

Plaintiffs' messages except with respect to information about lotteries, which is limited to dissemination of results only. Finally, Plaintiffs shall submit samples of their print advertisements, if any, to Defendant for approval under the GSST tariff in order to make certain that such print advertisements do not do what the telephone messages cannot, that is, advertise or promote any lottery. While Plaintiffs' print advertisements may advertise Plaintiffs' service, such advertisements are restricted in exactly the same manner as are their telephone messages and may not advertise, further or promote any lottery. *See* Attorney General Opinion 074-14 (January 9, 1974).